[No. D042575. Fourth Dist., Div. One. May 4, 2004.]

ABIGAIL VASQUEZ, a Minor, etc., et al., Plaintiffs and Appellants, v. RESIDENTIAL INVESTMENTS, INC., et al., Defendants and Respondents.

## COUNSEL

Anton C. Gerschler and Dena M. Acosta, for Plaintiffs and Appellants.

Bonnie R. Moss & Associates, Gena P. Marca; Barry, Bartholomew & Associates and Kathryn Albarian, for Defendants and Respondents.

## OPINION

**McDONALD, J.**—In August 2000 a jealous boyfriend broke into the apartment of his estranged girlfriend and murdered her. In this wrongful death action, plaintiffs allege defendants, owners of the apartment building,[1] were negligent by not replacing a missing pane of glass in the apartment's front door used by the murderer to obtain entry, and that negligence substantially contributed to the decedent's death by expediting the murderer's entry into the apartment. The trial court entered summary judgment for Owners, and we reverse.

I

FACTUAL BACKGROUND[2]

### A. *Condition of the Premises*

Abigail Ramirez (decedent) and her infant daughter lived with decedent's parents in an apartment (Apartment 6) in a building owned by Owners. The

[1] The complaint alleged the apartment building was owned by Residential Investments, Inc., Rentaree, L.L.C., and various individuals (collectively Owners) who owned or controlled the entities.

[2] Because we review this matter after summary judgment was entered in favor of Owners, we consider the facts most favorably to plaintiffs. We liberally construe plaintiffs' evidentiary submissions, strictly construe the evidence submitted by owners, indulge all reasonable inferences in support of plaintiffs, and resolve all evidentiary doubts or conflicts in favor of plaintiffs. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143].)

front door to Apartment 6 is a wood door with diamond- and triangular-shaped glass panes in the top half. When the family moved in, one of the glass panes was missing and a piece of cardboard covered the opening. Shortly after moving in, decedent's mother (Elsa) complained to the apartment manager and requested the missing pane be replaced because it was "pretty cold." Decedent's parents made several subsequent requests that the glass pane be replaced because they felt the absence of the pane created a security risk. However, the missing pane was never replaced.[3] Eventually, decedent's brother replaced the cardboard with a piece of plywood; he used finishing nails to tack the plywood to the door.

## B. *The August 2000 Murder*

Jesus Vasquez (Jesus), decedent's boyfriend and the father of her infant child, had visited Apartment 6 on numerous occasions. Jesus and decedent had lived together at his parents' apartment, but a few days before the murder decedent had moved into Apartment 6 with her parents following an argument with Jesus.

On August 6, 2000, Jesus heard that decedent was having an affair with her former boyfriend. Between 8:00 and 9:00 a.m. that morning, Jesus (armed with a knife) drove to Apartment 6 to confront decedent. He pounded on the door to Apartment 6 twice, and became angry "because they weren't letting [him] in." When no one responded to his demands, Jesus removed the plywood panel that replaced the glass pane in the door, reached through the opening, opened the door from the inside, and entered the apartment. Jesus testified that when Elsa and decedent refused to let him in, he recognized the missing pane provided him an easy opportunity to gain entrance because it was relatively easy to push out the wood panel (requiring only a "hard knock" to push it aside) without risking potential injury to his hand had he punched through a glass pane. Jesus testified he would not have tried to break in through a glass pane because of the risks and difficulties but instead would have waited outside until decedent emerged.

When Jesus entered Apartment 6, Elsa and decedent (along with decedent's infant daughter) were inside. Although Elsa tried to position herself between Jesus and decedent, Jesus pushed Elsa down and incapacitated her. He then confronted decedent, fatally stabbing her, cut the telephone line and escaped. Jesus was later convicted of murder.

---

[3] Approximately one month before the crime, the apartment manager had apparently purchased the materials necessary to replace the missing glass pane, but never arranged to replace it.

### C. *Extant Dangers*

No one was aware that Jesus was potentially violent. However, the neighborhood surrounding the apartment building had experienced the commission of some crimes, including violent crimes, and there were reports of an alleged rape in the apartment building, although the apartment manager viewed the reports of rape to be questionable. Decedent's family had experienced an incident in which two men, apparently in a case of mistaken identity, had attempted to enter Apartment 6 but then fled when decedent's father warned them not to enter. The apartment building itself was secured by fencing, including a fence topped by razor accordion wire on three sides.

## II

## PROCEDURAL BACKGROUND

The complaint for wrongful death against Owners contained a single cause of action based on premises liability. It alleged Owners, as lessors of Apartment 6, were negligent by not replacing the missing windowpane, and that negligence was a direct and proximate cause of the attack on and death of decedent.

Owners moved for summary judgment, contending the existence of a duty of care is a matter of law resolvable on summary judgment. Owners argued that under *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann M.*) and *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181 [91 Cal.Rptr.2d 35, 989 P.2d 121] (*Sharon P.*), disapproved on other grounds by *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, footnote 19 [107 Cal.Rptr.2d 841, 24 P.3d 493], a property owner has no duty to make his or her property crime-proof or take precautions against third party criminal conduct the owner had no reason to anticipate, and Owners had no reason to anticipate Jesus's violent behavior. Owners also asserted the failure to replace the windowpane did not create a dangerous condition because it created no unreasonable or substantial risk of injury, and Jesus's criminal conduct was a superseding intervening cause of the injury. Plaintiffs opposed the motion, arguing a landlord's duty to repair a door arises from numerous statutory and common law obligations, and therefore the only issue was whether the landlord's failure to replace the windowpane was a substantial factor in causing the injury. Plaintiffs argued that causation is ordinarily a question of fact and the evidence raised triable issues of fact as to the causal nexus between the missing glass pane and the resulting attack, and therefore summary judgment was inappropriate.

The court tentatively ruled in favor of Owners, concluding they had no notice of Jesus's violent tendencies or of criminal activity around the

apartment building, and therefore owed no duty to replace the windowpane. The court also ruled (apparently on the issue of causation) it was unlikely Jesus would have been stopped even had the glass pane been replaced. The court granted plaintiffs' request to obtain and submit testimony from Jesus. Plaintiffs submitted Jesus's deposition testimony to support their argument that an issue of fact existed on whether Jesus would have remained outside Apartment 6 if the missing pane had not provided him easy access.[4] The court confirmed its ruling in Owners' favor, holding the subject incident was not sufficiently foreseeable to give rise to a duty on Owners to prevent Jesus from entering Apartment 6. After plaintiffs' motion for reconsideration was denied, the court entered judgment in favor of Owners, and plaintiffs timely appealed.

## III

## LEGAL STANDARDS

### A Standard of Review

■ "The summary judgment procedure aims to discover whether there is evidence requiring the fact-weighing procedures of trial. [Citation.] '[T]he trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves.' [Citation.] The trial judge determines whether triable issues of fact exist by reviewing the affidavits and evidence before him or her and the reasonable inferences which may be drawn from those facts." (*Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127, 131 [40 Cal.Rptr.2d 249].) To prevail on a motion for summary judgment, a defendant must show one or more elements of the plaintiff's cause of action cannot be established or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (o).) The evidence of the moving party is strictly construed and that of the opponent liberally construed, and any doubts as to the propriety of granting the motion are to be resolved in favor of the party opposing the motion. (*Branco v. Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184, 189 [43 Cal.Rptr.2d 392].)

■ Consequently, summary judgment should be granted only when a moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) Because a motion for summary judgment raises only questions of law, we independently review the parties' supporting and opposing papers and apply the same standard as the trial court to determine whether there exists a triable

---

[4] Owners objected to Jesus's testimony as irrelevant and without foundation. The court did not rule on these objections.

issue of material fact. (*City of San Diego v. U.S. Gypsum Co.* (1994) 30 Cal.App.4th 575, 582 [35 Cal.Rptr.2d 876]; *Southern Cal. Rapid Transit Dist. v. Superior Court* (1994) 30 Cal.App.4th 713, 723 [36 Cal.Rptr.2d 665].) In practical effect, we assume the role of a trial court and apply the same rules and standards that govern a trial court's determination of a motion for summary judgment. (*Lopez v. University Partners* (1997) 54 Cal.App.4th 1117, 1121–1122 [63 Cal.Rptr.2d 359].)

## B. *Negligence Principles*

■ The elements of a cause of action for negligence are: the "defendant had a duty to use due care, that he [or she] breached that duty, and that the breach was the proximate or legal cause of the resulting injury. [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 292–293 [253 Cal.Rptr. 97, 763 P.2d 948].) "[E]very [negligence] case is governed by the rule of general application that all persons are required to use ordinary care to prevent others from being injured as the result of their conduct." (*Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].) The existence of a legal duty to use reasonable care in a particular factual situation is a question of law for the court to decide. (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 265 [80 Cal.Rptr.2d 196].) However, the elements of breach of that duty and causation are ordinarily questions of fact for the jury's determination. (*Andrews v. Wells* (1988) 204 Cal.App.3d 533, 538 [251 Cal.Rptr. 344].)

## IV

## ANALYSIS

### A. *The Legal Issue of Duty*

Plaintiffs assert Owners were negligent by not replacing the missing windowpane in the front door of Apartment 6, which was a substantial cause of decedent's death. Owners prevailed on summary judgment by convincing the trial judge that, as a matter of law under the facts of this case, Owners owed plaintiffs no duty that was breached. We review the record de novo to determine whether Owners conclusively negated this necessary element of plaintiffs' case. (*Ann M., supra*, 6 Cal.4th at pp. 673–674.)

The existence of duty is a question of law to be decided by the court (see, e.g., *Sharon P., supra*, 21 Cal.4th at p. 1188 [91 Cal.Rptr.2d 35, 989 P.2d 121]), and the courts have repeatedly declared the existence of a duty by landowners to maintain property in their possession and control in a reasonably safe condition. (See, e.g., *Rowland v. Christian* (1968) 69 Cal.2d 108, 119 [70 Cal.Rptr. 97, 443 P.2d 561] (*Roland*).)

However, acknowledgment of the broad proposition that landowners have a duty to exercise reasonable care to maintain their property in a safe condition provides scant guidance to a court that must determine the existence of the landlord's duty in a particular case. Because the question of the legal duty of a landlord has perplexed many courts and generated an amorphous body of law, to answer the question presented in this case we preface our analysis with a brief consideration of the question of duty in the broader context of tort law.

When a defendant has not intended to injure a plaintiff, and the defendant is not deemed for policy reasons to be strictly liable for a plaintiff's injuries regardless of fault, a defendant's liability for a plaintiff's injuries is determined under negligence principles. (Prosser & Keeton, Torts (5th ed. 1984) § 7, pp. 31–32.) The elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of the duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages). (*Id.,* § 30, pp. 164–165.) The first element—existence of a duty to be decided by the court rather than the jury—"is not an immutable fact, but rather an expression of policy considerations leading to the legal conclusion that a plaintiff is entitled to a defendant's protection." (*Ludwig v. City of San Diego* (1998) 65 Cal.App.4th 1105, 1110 [76 Cal.Rptr.2d 809].) To determine the standard of conduct required by the first element of negligence, we generally undertake a risk-benefit analysis "by balancing the risk, in the light of the social value of the interest threatened, and the probability and extent of the harm, against the value of the interest . . . the actor is seeking to protect, and the expedience of the course pursued. For this reason, it is usually . . . difficult, and often simply not possible, to reduce negligence to any definite rules; it is 'relative to the need and the occasion,' and conduct . . . proper under some circumstances becomes negligence under others." (Prosser & Keeton, *supra,* § 31, p. 173, fns. omitted.) Stated differently, " 'duty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk." (*Id.,* § 53, p. 356.) Thus, although the articulated standard is the same, the question of what is reasonable will depend in each case on the particular circumstances facing that defendant considering the foreseeability of the risk of harm balanced against the extent of the burden of eliminating or mitigating that risk.

■ This cursory overview of negligence law helps focus the threshold question present in every negligence action: How do we define the scope of the defendant's duty established by law for the protection of others against a risk of harm? Out of the generic obligations owed by landowners to maintain

property in a reasonably safe condition, the law of negligence in the landlord-tenant context has evolved to impose a duty of reasonable care on the owner of an apartment building to protect its tenants from foreseeable third party criminal assaults. Thus, the question of a landlord's duty is *not* whether a duty exists *at all*, but rather what is the *scope* of the landlord's duty given the particular facts of the case? Our reference to the *scope* of the landlord's duty is intended to describe the specific steps a landlord must take in a given specific circumstance to maintain the property's safety to protect a tenant from a specific class of risk. It is this question that we decide as a matter of law.

When a court strives to answer this question, we believe it should limit its inquiry to the specific action the plaintiff claims the particular landlord had a duty to undertake in the particular case. This *specific action* approach was used, albeit sub silentio, by the Supreme Court in both *Ann M.* and *Sharon P.* In both of those cases, the Supreme Court considered whether, as alleged by the plaintiffs, the scope of the duty owed by owners of a shopping center and a commercial parking garage extended to providing security guards to protect its tenants and customers from violent crimes. (*Ann M., supra*, 6 Cal.4th at p. 670; *Sharon P., supra*, 21 Cal.4th at pp. 1188–1189.) Only after the scope of the duty under consideration is defined may a court meaningfully undertake the balancing analysis of the risks and burdens present in a given case to determine whether the specific obligations should or should not be imposed on the landlord. If only the broad proposition that landlords have a duty to exercise reasonable care to maintain their property in a safe condition is considered rather than focusing on the scope of duty, then in every premises liability negligence case the existence of the duty is present, there is no duty issue for the court to determine and each case would be decided by the jury's determination of breach of duty, causation and damages. The law has not evolved in this manner.

■ The factors to be weighed in the balancing analysis necessary to determine the scope of the duty in a case will vary with each case. However, a review of the cases addressing the question of duty in the landlord-tenant context reveals two primary considerations: the foreseeability of the harm and the burden on the landlord created by the duty to protect against the harm.[5] In

---

[5] Many of the other factors that can be weighed in this balancing test were set forth in *Rowland, supra*, 69 Cal.2d at pages 112 and 113, although the extent to which those factors have been employed by the courts appear to have been in a secondary or tertiary role. Aside from foreseeability and extent of burden to the defendant, which have evolved to become the primary factors considered in every case, other factors include: "the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the . . . consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance

both *Ann M.* and *Sharon P.*, the Supreme Court adopted this approach to determine whether the scope of the landlords' duties extended to providing security guards, and evaluated the degree to which the attacks were foreseeable considering the circumstances weighed against the extent of the burden to the defendants of providing security guards, as urged by the plaintiffs. " ' "[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required." [Citation.]' " (*Ann M., supra,* 6 Cal.4th at pp. 678–679, quoting *Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 125 [211 Cal.Rptr. 356, 695 P.2d 653] (*Isaacs*).)

In *Ann M.* the Supreme Court determined the plaintiff had not established the degree of foreseeability of harm necessary to require the security measures requested. The plaintiff, employed by one of the tenants in defendants' commercial shopping center, was raped and robbed at knifepoint in the store where she worked, and sued the landlords for negligence. (*Ann M., supra,* 6 Cal.4th at pp. 670–671.) In deciding that violent criminal assaults were not sufficiently foreseeable to impose a duty on the defendants to provide security guards in common areas, the court noted there ·was no evidence that defendants had notice of prior similar incidents occurring on the premises, evidence of other criminal conduct on the premises was not similar in nature to the violent assault suffered by plaintiff, and neither evidence of the crime rate in the surrounding neighborhood nor evidence that transients were present on the premises was sufficient to establish a high degree of foreseeability. (*Id.* at pp. 679–680.) Because the court concluded the monetary and social burdens of hiring of security guards were neither minimal nor insignificant, the court concomitantly held that a high degree of foreseeability of harm was required, which could "rarely, if ever, . . . be proven in the absence of prior similar incidents of violent crime on the landowner's premises." (*Id.* at p. 679, fn. omitted.)

Similarly, in *Sharon P.* the court declined to impose a duty on the defendant landlords to provide security guards in their underground commercial parking garage because the sexual assault on the plaintiff was not sufficiently foreseeable. Although there was evidence the bank in the building had been robbed seven times in the prior 27-month period, and several hundred crimes, including two rapes, had occurred in the 50 square blocks surrounding the building, no crimes had been reported in the garage in the 10

for the risk involved." (*Ibid.*) We do not mean to impliedly denigrate the continued vitality of these remaining *Rowland* factors, because one or more may apply in any given case to alter the balance in light of policy considerations.

years preceding the attack. (*Sharon P., supra*, 21 Cal.4th at pp. 1186, 1191, 1194–1195.) The court found it significant that none of the bank robberies involved violent attacks, and held that their dissimilarity to the sexual assault on the plaintiff, even when considered with the other evidence, did not establish the high degree of foreseeability necessary to justify the "significant burden" (*id.* at p. 1195) of imposing a duty to provide security guards in the garage.[6] (*Id.* at p. 1191.)

Numerous other cases have decided the question of a landlord's negligence liability for a tenant's injuries by considering the foreseeability of the injury balanced against the burden of protecting against that injury.[7] For example, in *7735 Hollywood Blvd. Venture v. Superior Court* (1981) 116 Cal.App.3d 901 [172 Cal.Rptr. 528], the plaintiff was raped in her apartment, and she sued her landlord, claiming there was a duty to provide lighting and security devices sufficient to prevent the attack. The court rejected the claim because the plaintiff had not alleged sufficient foreseeability of the attack to justify the vague (and thus potentially onerous) duty she sought to impose on the defendant. (*Id.* at p. 905.) In *Totten v. More Oakland Residential Housing, Inc.* (1976) 63 Cal.App.3d 538 [134 Cal.Rptr. 29] the plaintiff, wounded by a shooting on the premises of the apartment building, sued the landlord,

---

[6] The plaintiff in *Sharon P.* made the alternate argument that even if the landlords were not required to hire security guards because a high degree of foreseeability could not be established, they were still required to provide protection by "simple and less burdensome means" including improving lighting and cleanliness, hooking up an already installed security camera over the elevator, and requiring existing personnel to walk through the garage periodically, because it was foreseeable that there would be violent third party crimes in underground garages. (*Sharon P., supra*, 21 Cal.4th at pp. 1195–1196.) The Supreme Court rejected the claim, again citing the record's deficiency in establishing the foreseeability of violent attacks similar to the one suffered by the plaintiff, but *also* noting the plaintiff's proposed alternate measures were vague and impossible to define, were of questionable efficacy, and were not necessarily less burdensome than hiring security guards. (*Id.* at p. 1196.) This analysis dovetails with our conclusion that the legal issue of duty should focus on the specific measures the plaintiff claims the landlord had the duty to undertake because the efficacy and burdensomeness of any proposed duty can only be evaluated by examining those specific measures.

[7] Many of the cases addressing the issue have not drawn the semantic distinction between the *existence* of a landlord's duty and the *scope* of that duty in a given factual situation. (See, e.g., *Cohen v. Southland Corp.* (1984) 157 Cal.App.3d 130 [203 Cal.Rptr. 572]; *Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301 [34 Cal.Rptr.2d 498]; *Isaacs, supra*, 38 Cal.3d 112.) This omission may well have led to confusion about the court's job in deciding, as a matter of law, the scope of the duty. Adding to the confusion is the fact that some of these same cases have not been explicit in weighing the burden on the landlord were it placed under a duty to conduct itself in the manner proposed by the plaintiff against the degree of foreseeability of the specific harm to the plaintiff. (See, e.g., *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490 [229 Cal.Rptr. 456, 723 P.2d 573]; *Sturgeon, supra*, 29 Cal.App.4th 301.) These cases were not necessarily wrong in their conclusions; our only concern is that they have not been precise or explicit in the language used to explain their decisions, thereby rendering more difficult the trial court's task. (See, e.g., *Cohen, supra*, 157 Cal.App.3d at pp. 139–143.)

claiming there was a duty to provide "proper guard service or other supervision of the premises." (*Id.* at p. 541.) The court rejected the claim, primarily on the ground that the plaintiff had not alleged sufficient foreseeability to justify the duty she sought to impose on the defendant, but also noting that "both the proposed duty and the measures to be applied in discharge of the duty defy exact delineation and suffer from inherent vagueness. The questions posed in *Goldberg* [*v. Housing Auth. of Newark* (1962) 38 N.J. 578 [186 A.2d 291]] could all be asked here: 'To which multi-family houses would the duty apply? Would it depend upon the number of tenancies? If so, can we now fix the number? And if the duty springs from a combination of tenancies and prior unlawful events, what kind of offenses will suffice, and in what number, and will crimes next door or around the corner or in the neighborhood, raise the obligation? And if a prescient owner concludes the duty is his, what measures will discharge it? It is an easy matter to know whether a stairway is defective and what repairs will put it in order. . . . [B]ut how can one know what measures will protect against the thug, the narcotic addict, the degenerate, the psychopath and the psychotic?' These questions by themselves signify the formidable task of defining the exact scope of the duty and the measures required of the landlord to meet that duty. We are in full agreement with the *Goldberg* court that to predicate tort liability upon such a loose and vague standard would be genuinely unfair to the landlord . . . ." (*Totten, supra*, at p. 546, quoting *Goldberg, supra*, at p. 297.)

Similarly, in *Rogers v. Jones* (1976) 56 Cal.App.3d 346 [128 Cal.Rptr. 404], the court declined to impose a duty on a football stadium parking lot operator to prevent an attack by one fan on another. The court held that the measures needed to prevent that incident would be unreasonably burdensome, necessitating one guard be provided for every fan, and concluding the harm to the plaintiff was not sufficiently foreseeable to warrant that heavy burden. (*Id.* at p. 352.) Finally, in *Pamela W. v. Millsom* (1994) 25 Cal.App.4th 950 [30 Cal.Rptr.2d 690], the plaintiff was raped by an intruder into her condominium, one of four in the condominium complex. During the rape, the assailant called Pamela by name, and told her that he had been watching her. She sued her landlords, alleging negligence, and they obtained summary judgment on the ground they owed her no duty because the attack was not reasonably foreseeable in the absence of prior similar incidents on the premises. (*Id.* at pp. 953–955.) On appeal, this court undertook an analysis of the landlords' duty in the context of *Ann M.* and affirmed, concluding the rape was not sufficiently foreseeable to impose the extraordinarily burdensome duty on the defendants to physically secure the premises in the manner demanded by the plaintiff.[8] (*Pamela W., supra*, at p. 959.)

---

[8] Owners rely on *Hassoon v. Shamieh* (2001) 89 Cal.App.4th 1191 [107 Cal.Rptr.2d 658] and *Riley v. Marcus* (1981) 125 Cal.App.3d 103 [177 Cal.Rptr. 827] to assert that a high degree of foreseeability is required before a landowner will be liable for not protecting an

In contrast, in *Kwaitkowski v. Superior Trading Co.* (1981) 123 Cal.App.3d 324 [176 Cal.Rptr. 494], plaintiff was raped in a common area in her apartment building, and she sued the landlord, alleging that the lock to the common hallway was broken and a robbery had previously occurred in the same hallway. The court held that the burden of fixing the lock on the lobby door placed the landlord under a minimal burden, and the slight foreseeability of the rape considering the prior robbery in the same location was sufficient to impose a duty on the landlord to provide the "first line of defense" against intruders by providing working locks. (*Id.* at p. 333.) Similarly, in *Gomez v. Ticor* (1983) 145 Cal.App.3d 622 [193 Cal.Rptr. 600] (disapproved on other grounds by *Sharon P., supra,* 21 Cal.4th at p. 1193), plaintiffs' decedent was killed in a parking garage when he interrupted a robbery in progress. In reversing summary judgment for the owner of the parking garage, the court noted the history of theft and vandalism in the garage, and concluded that it was at least somewhat foreseeable that a garage patron would interrupt such an act and be subject to a violent attack by the perpetrator. Balanced against the burden of providing a " 'first line of defense' " against intruders, which the court did not precisely define but concluded was minimal and did "not place an onerous burden upon defendant or society," the court held defendant had a duty to implement those minimal measures. (*Id.* at pp. 632–633.)

Although these cases have resolved as a matter of law the question of the scope of the landlord's duty, often by engaging in an implicit balancing process, the method used to reach their conclusions is unclear. We discern

---

invitee against criminal assault. Although both cases indeed discussed the absence of prior similar incidents as militating against foreseeability (*Hassoon, supra,* at p. 1195; *Riley, supra,* at p. 109), neither case examined the precise actions that the plaintiff's proposed duty would have entailed, and therefore could not assess or weigh the burden on the landlord (if it was placed under a duty to conduct itself in the manner proposed by plaintiff) against the degree of foreseeability of the harm. Indeed, in *Hassoon,* the plaintiff was injured after the defendant-landowner had intervened to rescue a third party (who was being beaten by a group of men) and had brought the victim into the safe harbor of his store where the plaintiff was shopping. The attackers had not been deterred and shot at the victim inside the store, injuring the plaintiff. The plaintiff's only specific articulation of the duty owed was that the landowner should have left the victim outside so that, when violence escalated, the shooting would have occurred outside the store. (*Id.* at pp. 1193–1194.) Under our analytical approach, recognition and assessment of the cost of the specific duty asserted by plaintiff—sacrifice of another human life—may well have militated against imposing such a legal duty even with the highest degree of foreseeability, and therefore we do not perceive *Hassoon* as supporting Owners' argument here. Owners' reliance on *Riley* is even less helpful. First, it is open to question whether *Riley* remains good law. (See *Isaacs, supra,* 38 Cal.3d at pp. 125–129.) More importantly, the *Riley* plaintiff argued that, although the landlord had provided locks, the landlord breached his duty to provide *adequate* locks or security. (*Riley, supra,* at p. 107.) As in *Sharon P., supra,* 21 Cal.4th 1181, (see fn. 5, *ante*), the *Riley* plaintiff's proposed duty was vague and impossible to define and may have been quite burdensome. In our view, whether *Riley* was correctly decided cannot be determined because the specific steps that comprise the essential grist for our analytical mill are absent.

from these cases the following analytical approach to evaluate the threshold legal question of duty that a court must resolve.

■ First, the court must determine the specific measures the plaintiff asserts the defendant should have taken to prevent the harm. This frames the issue for the court's determination by defining the scope of the duty under consideration. Second, the court must analyze how financially and socially burdensome these proposed measures would be to a landlord, which measures could range from minimally burdensome to significantly burdensome under the facts of the case.[9] Third, the court must identify the nature of the third party conduct that the plaintiff claims could have been prevented had the landlord taken the proposed measures, and assess how foreseeable (on a continuum from a mere possibility to a reasonable probability) it was that this conduct would occur. Once the burden and foreseeability have been independently assessed, they can be compared in determining the scope of the duty the court imposes on a given defendant. The more certain the likelihood of harm, the higher the burden a court will impose on a landlord to prevent it; the less foreseeable the harm, the lower the burden a court will place on a landlord.[10]

The trial court here granted summary judgment for Owners after concluding they did not owe plaintiffs a legal duty because they had no knowledge of facts to suggest that Jesus had violent propensities and therefore it was not reasonably foreseeable he would violently attack decedent. Employing the analytical approach set forth above, we review de novo the trial court's order granting summary judgment for Owners.

■ We begin with the specific duty plaintiffs seek to impose on Owners: the obligation to restore the integrity of the front door to Apartment 6 by replacing the missing glass pane. The action plaintiffs contend Owners should have but did not take defines the scope of the duty that we determine as a matter of law should or should not be imposed. The question we must answer is: Did Owners owe plaintiffs a duty to make reasonable efforts to restore the protections that an intact front door would have provided with replacement of the missing windowpane? To answer this question we first evaluate the extent of the burden placed on Owners were they required to take the requested

---

[9] Various case-specific factors may come into play in making this determination, including the size of the property in question. (See *Pamela W., supra*, 25 Cal.App.4th at p. 958 [what is a minimal financial burden for owner of large apartment building may be a significant burden for owner of a smaller one].)

[10] Finally, where appropriate to the case, other mitigating or aggravating factors may be taken into account in the weighing process, including those set forth in *Rowland, supra*, 69 Cal.2d at pages 112 and 113. (See fn. 4, *ante*.) However, neither party asserts the remaining *Rowland* factors would influence the analysis here, and we therefore do not consider them further.

action. The evidence is undisputed that the burden would have been minimal: the materials for replacing the missing pane had already been purchased, and the cost of completing the pane replacement would have been approximately $15.00. We conclude that, under the facts presented, plaintiffs' proposed duty is so minimally burdensome that it militates in favor of imposing that duty on Owners.

■ Where " ' "the harm can be prevented by simple means, a lesser degree of foreseeability may be required." [Citation.]' " (*Ann M., supra*, 6 Cal.4th at p. 679.) Considering the minimal burden on Owners to take the action proposed by plaintiffs, we consider how foreseeable it was that an intruder might utilize a missing windowpane in the front door to enter the apartment. The evidence, viewed most favorably to plaintiffs, showed plaintiffs complained to the manager that the missing windowpane was a security risk, at least one incident had occurred involving an aborted entry by an intruder into Apartment 6, and assaultive crimes had been reported in other apartments in the building. We conclude that, if the facts known to Owners were sufficient to notify them of a slight likelihood that an intruder might seek to enter the apartment, they had a duty to take the minimally burdensome steps available to restore the integrity and security provided by a repaired front door.

■ Owners contend that because they had no knowledge of Jesus's violent propensities, they could not have foreseen that he would violently attack someone on the premises and therefore had no duty to take any action to prevent the attack. However, a high degree of foreseeability is not required to impose the minimally burdensome measures urged here. (See *Musgrove v. Ambrose Properties* (1978) 87 Cal.App.3d 44, 52–53 [150 Cal.Rptr. 722] [lesser degree of foreseeability is required when the proposed duty involves simple, effective, and easily defined steps].) Moreover, foreseeability depends not on whether a particular plaintiff's injury was foreseeable as a result of a particular defendant's conduct, but instead on whether the conduct at issue created a foreseeable risk of a " 'particular kind of harm.' " (*M.W. v. Panama Buena Vista Union School Dist.* (2003) 110 Cal.App.4th 508, 519 [1 Cal.Rptr.3d 673]; *Ballard v. Uribe* (1986) 41 Cal.3d 564, 572–573, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].) The particular type of harm risked by a weakened front door is that the "first line of defense" against intruders (*Kwaitkowski v. Superior Trading Co., supra,* 123 Cal.App.3d at p. 333) will not protect the occupants against intruders.[11] As articulated by *Kwaitkowski*, "[f]oreseeability does not require prior identical or even similar events"

---

[11] The courts in other states, although employing rationales different from our analysis, have nevertheless imposed similar obligations of care on landlords. Although the relationship of landlord and tenant traditionally has not been considered to be a special relationship creating a duty on the landlord to protect his or her tenant from the risk of crime (see Rest. 2d Torts, § 314A), the increase in urbanization, crime, and the number of people who rent and must rely

(*Kwaitkowski, supra,* 123 Cal.App.3d at p. 329), and the court found that the plaintiffs had alleged sufficient facts to justify imposition of a duty of care upon the landlord concerning the lock, explaining "[t]he instant case involves a defective lock on the lobby door that provided easy access to strangers. As the court noted in [*7735 Hollywood Blvd. Venture v. Superior Court, supra,* 116 Cal.App.3d 901], the utility of a light outside the door was questionable. Here, [in contrast,] a properly functioning front door lock is a vital first line of defense." (*Kwaitkowski v. Superior Trading Co., supra,* 123 Cal.App.3d at p. 333.)

We conclude in this case that the degree of foreseeability of a criminal intruder by Owners was sufficiently high, compared with the burden of the duty proposed by plaintiffs to replace the glass pane, to support imposition of that duty on Owners.

### B. *The Factual Issue of Causation*

Owners alternatively argue summary judgment was proper because there was no triable issue of fact on whether failure to replace the missing windowpane was a substantial cause of decedent's death. Owners argue (1) it is speculation whether the missing windowpane substantially contributed to

---

on landlords to provide basic protection against crime has led to a growing tendency to recognize the circumstances in which a duty to provide some security will arise. Varying rationales have been employed, including the general duty owed by landowners, the specific control exercised by a landlord over his or her property, the contractual undertakings that accompany a landlord-tenant relationship, and/or administrative regulations. (See *Kline v. 1500 Massachusetts Avenue Apartment Corp.* (D.C.Cir. 1970) 141 U.S. App. D.C. 370 [439 F.2d 477, 483–486] [duty to provide security in common area based on control]; *Braitman v. Overlook Terrace Corp.* (1975) 68 N.J. 368 [346 A.2d 76, 79–85] [duty to provide adequate lock on door to apartment based on control and administrative regulation]; *Feld v. Merriam* (1984) 506 Pa. 383 [485 A.2d 742, 746–747] [duty to provide protection in garage based on undertaking program of security]; *Lay v. Dworman* (1986) 1986 OK 85 [732 P.2d 455, 458–459] [duty to repair sliding glass door of apartment based on contractual undertaking]; *Reider v. Martin* (1987) 359 Pa.Super. 586 [519 A.2d 507, 510] [duty to provide secure lock to common front door based on undertaking]; *Scott v. Watson* (1976) 278 Md. 160 [359 A.2d 548, 553–555] [duty to provide security in common area may be based on prior criminal activity or on undertaking].) As observed by the court in *Warner v. Arnold* (1974) 133 Ga.App. 174 [210 S.E.2d 350, 353–354], " '[t]he landlord is no insurer of his [or her] tenant's safety, but . . . is certainly no bystander.' [Citation.] This premise and the authority previously cited, is *coupled with the undeniable fact that the purpose for having secure locks on the door to the plaintiffs' apartment, was to prevent unauthorized entry thereto and the accompanying wrongful criminal acts.* The immediacy of the connection between the inadequate (although functioning) lock, the landlord's notice of the inadequacy, either actual or constructive, and the burglary and arson, compels us to hold that the landlord is not insulated as a matter of law, and that the jury should properly pass on the questions" of foreseeability, intervening causation, and the adequacy of the lock. (Italics added; accord, *Stubbs v. Panek* (Mo.Ct.App. 1992) 829 S.W.2d 544, 546–547 [landlord has no duty to protect tenant from criminal attack by a third person but has duty to exercise ordinary care to keep leased premises in a reasonably safe condition; triable issue of fact whether front door was not reasonably safe because gap in door frame made it possible to unlock the door with a comb, credit card or common screwdriver].)

Jesus's entry and assault on decedent, and (2) Jesus's conduct must be deemed an intervening and superseding cause of decedent's death.

*Cause in Fact*

 In a negligence action the plaintiff must show the defendant's act or omission (breach of duty) was a cause of the plaintiff's injury. (*Jackson v. Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830, 1846 [20 Cal.Rptr.2d 913].) The element of causation generally consists of two components. (*Id.* at p. 1847.) The plaintiff must show (1) the defendant's act or omission was a cause in fact of the plaintiff's injury, and (2) the defendant should be held responsible for negligently causing the plaintiff's injury. (*Ibid.*) The second component is a normative or evaluative one that asks whether the defendant should owe the plaintiff a legal duty of reasonable care under the circumstances of the case. (*Id.* at pp. 1847–1848.) Because we have concluded Owners did owe a duty to restore the integrity of Apartment 6's front door, the second component of causation is satisfied.

 The first component of causation in fact generally is a question of fact for the jury. Causation in fact is shown if the defendant's act or omission is "*a substantial factor*" in bringing about the plaintiff's injury. (*Jackson v. Ryder Truck Rental, Inc., supra,* 16 Cal.App.4th at p. 1847; *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1051–1052 [1 Cal.Rptr.2d 913, 819 P.2d 872].) This issue ordinarily may not be resolved on summary judgment. (*Nichols v. Keller* (1993) 15 Cal.App.4th 1672, 1687 [19 Cal.Rptr.2d 601] [grant of summary judgment on causation improper unless under undisputed facts there is no room for a reasonable difference of opinion on casual nexus]; *Slaughter v. Legal Process & Courier Service* (1984) 162 Cal.App.3d 1236, 1250 [209 Cal.Rptr. 189].) Owners, relying on *Saelzler v. Advanced Group 400, supra,* 25 Cal.4th 763, assert the absence of the glass pane cannot be a cause in fact of decedent's death unless it is more probable than not that the glass would have prevented Jesus's attack on decedent, and argue it is pure speculation whether the presence of the glass pane would have deterred Jesus. *Saelzler* did affirm summary judgment in favor of the landlord on the causation issue because it rejected as speculation the plaintiff's proof of the causal nexus between the absence of additional security measures (to keep unauthorized intruders from entering the apartment complex) and the resulting assault because, in that case, there was no evidence the assailants *were* unauthorized intruders. (*Id.* at pp. 778–781.) *Saelzler* cautioned it was not setting an impossible bar for a plaintiff opposing a summary judgment motion on causation, explaining: "Plaintiff overstates her case when she contends that adopting the 'substantial factor' approach to the causation issue would make it virtually impossible to recover from landlords or other property owners for negligence in failing to take reasonable protective measures to safeguard

others from the criminal assaults of third persons. Plaintiff asserts that a finding of causation would be justified 'only if a criminal is caught, and then only if the criminal testifies what specific lack of deterrence on the property made easier his or her opportunity to commit the crime . . . .' We disagree, for we can readily hypothesize cases in which the evidence discloses an actual and substantial causal link between the criminal assault and the defendant's negligence. [¶] Thus, in a given case, direct or circumstantial evidence may show the assailant took advantage of the defendant's lapse (such as a failure to keep a security gate in repair) in the course of committing his attack, and that the omission was a substantial factor in causing the injury. Eyewitnesses, security cameras, even fingerprints or recent signs of break-in or unauthorized entry, may show what likely transpired at the scene. In the present case no such evidence was presented, but the circumstances in other cases may well be different." (*Id.* at p. 779.)

The evidence absent in *Saelzler* is present here: the assailant was caught, he testified to the easy mode of entry presented by the plywood patch over the opening, and he testified his self-preservation instinct would likely have dissuaded him from punching through a glass pane. We therefore conclude the evidence, viewed most favorably to plaintiffs, raises at least a triable issue of fact whether the condition of the door was a substantial factor in bringing about the attack. We express no opinion on whether the jury would so find.

### *Superseding Cause*

Owners assert they are absolved from liability because Jesus's act was an intervening or superseding cause of decedent's death. (*Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1, 18–19 [56 Cal.Rptr.2d 455].) Under the circumstances of this case, that question cannot be decided as a matter of law. To show Jesus's act was a superseding cause, Owners must establish as a matter of law that the intervening act was so highly unusual or extraordinary that the occurrence was not likely to happen and therefore was not foreseeable. (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts § 975, p. 366; *Bloomberg v. Interinsurance Exchange* (1984) 162 Cal.App.3d 571, 576–577 [207 Cal.Rptr. 853]; *Akins v. County of Sonoma* (1967) 67 Cal.2d 185, 199 [60 Cal.Rptr. 499, 430 P.2d 57].) However, the defendant need only foresee the risk of harm, not the particular intervening act (6 Witkin, *supra,* § 976, p. 367; *Jackson v. Ryder Truck Rental, Inc., supra,* 16 Cal.App.4th at pp. 1848–1849), and where the risk created by the breach of the duty is that the plaintiff is exposed to danger from criminal conduct, the criminal conduct is not automatically a superseding cause. (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 481 [50 Cal.Rptr.2d 785]; *Koepke v. Loo* (1993) 18 Cal.App.4th 1444, 1449 [23 Cal.Rptr.2d 34].)

As the Supreme Court recently observed in *Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 725 [110 Cal.Rptr.2d 528, 28 P.3d 249]: "It is well established that when a defendant's negligence is based upon his or her having exposed the plaintiff to an unreasonable risk of harm from the actions of others, the occurrence of the type of conduct against which the defendant had a duty to protect the plaintiff cannot properly constitute a superseding cause that completely relieves the defendant of any responsibility for the plaintiff's injuries. As the commentary to the Restatement Second of Torts explains: 'The problem which is involved in determining whether a particular intervening force is or is not a superseding cause of the harm is in reality a problem of determining whether the intervention of the force was within the scope of the reasons imposing the duty upon the actor to refrain from negligent conduct. If the duty is designed, in part at least, to protect the other from the hazard of being harmed by the intervening force, or by the effect of the intervening force operating on the condition created by the negligent conduct, then that hazard is within the duty, and the intervening force is not a superseding cause.' " (Quoting Rest.2d Torts, § 281, com. h, p. 8.)

█ In *Lugtu*, the defendants had directed a motorist to stop in the highway median, thereby exposing the motorist and his passengers to risks from other drivers, and another driver struck them. The *Lugtu* court, rejecting the defendants' argument that as a matter of law the conduct of the driver of the pickup truck that struck the plaintiffs constituted a superseding cause that relieved defendant of any legal responsibility for plaintiffs' injuries, observed the risk of harm posed by other negligent drivers was "one of the foremost risks against which [defendants'] duty of care was intended to protect. Accordingly, even if a jury were to determine that the driver of the pickup truck was negligent and that his negligence was a substantial and even predominant cause of plaintiffs' injuries, such a finding would not render the pickup driver's conduct a superseding cause that totally eliminates [defendants'] responsibility for plaintiffs' injuries—although such a finding certainly would provide ample justification for the jury, in applying comparative fault principles, to apportion the bulk of responsibility for the accident to the pickup driver, rather than to [defendants]." (*Lugtu v. California Highway Patrol, supra,* 24 Cal.4th at pp. 725–726.) By the same reasoning, the risk of criminal intruders is one of the foremost risks against which Owners' duty to repair the door windowpane was intended to protect, and the criminal conduct of Jesus is thus not a superseding cause that totally eliminates Owners' responsibility for decedent's death, although it would provide ample justification for the jury to apportion the bulk of responsibility to Jesus.

## DISPOSITION

The judgment is reversed. Appellants are entitled to costs on appeal.

Nares, Acting P. J., and McIntyre, J., concurred.

A petition for rehearing was denied May 27, 2004, and respondents' petition for review the Supreme Court was denied August 11, 2004.