Filed 4/2/21  Davis v. Murphy CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| STAN DAVIS, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CAROL MURPHY, <br><br> Defendant and Respondent. | B295926 <br><br> (Los Angeles County <br> Super. Ct. No. BC637746) |

APPEAL from a judgment of the Superior Court for Los Angeles County, Peter J. Mirich, Judge.  Affirmed.

Gavrilov & Brooks, Sheila Wirkus Pendergast, Ognian Gavrilov and Eliezer M. Cohen for Plaintiff and Appellant.

Gilsleider, McMahon, Molinelli & Phan, Tioni Anh Phan; Robie & Matthai, Kyle Kveton for Defendant and Respondent.

Appellant Stan Davis was rear-ended by a car driven by respondent Carol Murphy. Murphy admitted negligence. In a special verdict, a jury found that Murphy's negligence was not a substantial factor in causing harm to Davis; he was not awarded damages. After reviewing the entire record, we conclude that the jury was properly instructed on causation; substantial evidence supports the verdict; and the court did not abuse its discretion by admitting photographs. We affirm.

## FACTS

Davis has been an electrician since 1978. As the owner of his business, he drove to residences to work on repairs and installations. He does not have a contractor's license.

On June 2, 2015, Davis stopped at a red light on Van Nuys Boulevard, behind other cars. In his side mirror, he saw a car coming up behind him at "an extremely high speed, 50 miles an hour." He braced himself for impact by putting both feet on the brake pedal and grabbing the steering wheel. Within seconds, the car struck his van.

Davis was in shock after the impact. He testified that he had neck, shoulder and back pain and a bump on his head. The rear bumper of his van was damaged; he did not recall if the taillights were broken. He was later told at a body shop that the frame was bent.

Davis approached Murphy and asked if she was hurt; he did not tell her that he was hurt or seek medical attention at the scene. After exchanging information with Murphy, Davis drove 140 to 150 miles to his home. He had blurred vision, head issues, and pain but did not go to the hospital. That night, he was unable to sleep. The next day, he was in pain and unable to work.

Davis went to his health care provider, Kaiser, to address his headache, confusion, and pain in his neck and back. He was instructed to rest. He underwent an MRI, CT, and PET scans and was treated by a chiropractor and physical therapist.

Davis testified that he lost income after the collision. He did not work from June 2015 until the end of February 2016. His income in 2014 was $37,000, a monthly average of $3,100, working at least 40 hours per week. When he resumed working, he could only work 10 hours per week and earned about $700 per month. He explained that he could not raise his arm to work on recessed lights and wiring or crawl in attics. He was limited to changing switches or plugs.

Before the collision, Davis exercised at a gym and swam daily. Since the accident he cannot exercise or swim, has difficulty sleeping, shoulder pain, confusion, memory loss, anxiety, and depression. He denied having any shoulder or back pain or anxiety before the collision.

On cross-examination, Davis was confronted with medical records showing he was diagnosed with anxiety disorder in 2013 and 2014, before the crash. He had hip replacement surgery in 2014, telling doctors he had very poor quality of life; his medical records reported his inability to work due to hip pain. Around the same time, in 2014, his medical records state that he reported back pain. Though Davis claimed head trauma from the collision, medical records dated 10 days after the crash indicate that he only reported pain in his operated hip.

Davis saw a chiropractor, who did not treat his shoulder; no future treatments were recommended. Shoulder pain interferes with his activities but he is unwilling to have surgical repairs. In April 2016, he reported to Kaiser that he exercises at a moderate

to strenuous level for 300 minutes per week; in June 2016, he told Kaiser he swims and exercises daily.

Davis was asked on cross-examination why he answered during discovery that he did not know the dates he was unable to work or the amount of his income loss. He did not recall if he had to turn away customers after the collision. He did not know what his earnings were before the collision and did not produce invoices for 2010 to 2014. In May 2015, the month before the collision, his income was $1,440, not including business expenses. He testified that he did not request a post-accident "off-work" note from his doctor because he is self-employed.

Luis Vargas has worked for Davis since 1986. He testified that Davis worked full time, without physical or mental limitations, before the accident. Afterward, Davis complained that his shoulder affected his ability to work and he seemed upset. They had to turn away work requests. A business owner who knows Davis similarly testified that Davis complained of inability to work and "seemed a little more miserable" after the collision. A former coworker stated that he last worked with Davis in 2011 or 2013; he was unaware of Davis's physical condition in the years before and after the accident.

Dr. Richard Rhee, a diagnostic radiologist, testified as a defense expert. X-rays taken three weeks after the collision showed "degenerative changes, findings that are typical that occur in everybody as we age." Degeneration was visible in Davis's shoulder, spine, and neck and may have been exacerbated if he used his shoulders a lot, by lifting weights or swimming: once the cartilage starts to thin it does not regrow and exercise can accelerate degeneration. X-rays also showed very advanced osteoarthritis in the hip, which resulted in a hip replacement

surgery before the accident.  The collision did not change Davis's shoulder or hip condition.

In MRI images, Dr. Rhee saw rotator cuff tears that "are very old.  They're probably years old."  Muscle atrophy in the right shoulder was "profound."  He opined that the tear was not caused by the crash.

Dr. Rhee explained that muscles take years to atrophy and "since the incident occurred two months before this [MRI], there's simply no way that this would happen in two months."  There was no evidence of traumatic injury, such as a fracture, dislocation, or bone contusion.  He stated, "It's essentially, I think, a medical certainty that those [shoulder] tears would be preexisting."  He acknowledged that Davis could be experiencing pain but could not say that Davis's preexisting condition was exacerbated by the collision.

Orthopedic surgeon James Fait, a defense expert, examined Davis in 2017 and reviewed his medical records.  During the examination, Davis seemed genuinely confused as to simple matters, such as his age.  Records showed that Davis had a final visit with a chiropractor in August 2015; his last medical visit related to the crash was in December 2015.

Dr. Fait testified that the 2015 MRI showed "almost entirely a complete loss of the rotator cuff muscle" and "significant atrophy of the muscles of the rotator cuff," which was partially replaced by fat.  Atrophy and fatty infiltration develop over two to five years; it could not occur within two months of the crash.  No fracture or dislocation caused Dr. Fait to believe that Davis would need time away from work.  Rotator cuff repair is a substantial surgery that requires three months off work;

however, he opined that the surgery would have been indicated even if the collision had never occurred.

Dr. Fait agreed that Davis did not complain of shoulder pain until after the crash. Dr. Fait disagreed that the collision made an asymptomatic rotator cuff tear symptomatic. It is more likely that Davis's pain was caused by whiplash. Over time, 22 percent of patients experience symptoms from a rotator cuff tear. Dr. Fait noted that Davis's chest X-ray in 2012 indicated a chronically torn rotator cuff. He found no evidence "that the tear progressed as a result of the accident." By participating in physical therapy after the accident, Davis improved to a near normal range of motion in his shoulder. Dr. Fait explained, "[H]ad the tear actually been exacerbated or enlarged traumatically . . . you don't regain active motion of your arm again."

The defense called Dr. Gilbert L. Hyde, an orthopedic surgeon at Kaiser who treated Davis for shoulder pain in July 2015. Dr. Hyde saw no signs of trauma to Davis's shoulder or head. He ordered an MRI, which showed a nontraumatic preexisting rotator cuff tear. Dr. Hyde opined that, more likely than not, "the collision aggravated the preexisting condition."

Dr. Ricky Menor treated Davis at Kaiser, six days after the accident. Davis had some neck, shoulder, and back discomfort, "a little bit of dizziness," imbalance, and "a little bit of anxiety from the accident." Davis did not report head trauma, blunt trauma, or loss of consciousness. He was previously diagnosed at Kaiser with hypertension, generalized anxiety disorder, and osteoarthritis in the hips and knees.

Dr. Menor observed that Davis's muscles were tense and tight. He opined, "I felt that he had muscle strain with some

6

spasms, and . . . a little bit of anxiety as well because of the accident." X-rays were taken to ensure there were no fractures or dislocation. He recommended conservative treatment such as rest, ice packs, heat, massage, and physical therapy.

Dr. Menor believes Davis's complaints of head, vision, and shoulder problems were related to or aggravated by the accident. However, medical records at Kaiser showed that in June 2015, there was no diagnosis of or complaints about a shoulder injury. Instead, Davis wanted cortisone shots in both knees and was angry when they were denied.

At a follow-up visit on June 24, 2015, Davis complained of neck, shoulder, and hip discomfort. A CT scan of his head was normal, as were his cervical spine films. Dr. Menor told Davis to continue with physical therapy. Dr. Menor last saw Davis in September 2015, when Davis "came in for an extension of his off-work order." Davis's MRI "showed some chronic tears, I think, in the ligaments." Davis was diagnosed with a "nontraumatic right rotator cuff tear."

## PROCEDURAL HISTORY

Davis filed a personal injury suit, which came to trial in October 2018. After the parties rested, Davis asked the court to direct a verdict that the collision was a substantial factor in causing harm to him. Murphy sought a directed verdict as to past and future lost earnings. The court denied both motions.

In summation, counsel for Davis argued that causation is "an all-or-nothing proposition. Either he was hurt or not hurt. . . . And if you say no, he was not hurt, this is all a huge ruse, then we're done. Check 'no' . . . and we all go home." Counsel argued that all of the doctors "state that this man was

injured. This means you've got to check 'yes.' There is no dispute to that."

In a special verdict, the jury answered "no" to the following question: "1. Was Defendant Carol Murphy's negligence a substantial factor in causing harm to Plaintiff Stan Davis?" Davis recovered nothing. Judgment was entered for Murphy.

## DISCUSSION

### 1. Jury Instructions on Causation

The court instructed the jury with CACI No. 424, which is given when the defendant admits liability but contests causation and damages. ("Directions for Use" following CACI No. 424.) The instruction incorporates the "substantial factor" standard.[1]

The court gave two further instructions with "substantial factor" language. One was CACI No. 430, which defines the term "substantial factor."[2] The court gave a tort damages instruction

---

[1] Using CACI No. 424, the jury was instructed: "Stan Davis claims that he was harmed by Carol Murphy's negligence. Carol Murphy agrees that she was negligent, but denies that the negligence caused Stan Davis any harm. . . . [¶] To establish his claim against Carol Murphy, Stan Davis must prove both of the following: One, that Stan Davis was harmed; and two, that Carol Murphy's negligence *was a substantial factor in causing Stan Davis's harm.*" (Italics added.)

[2] The instruction read: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct."

8

requested by both parties, CACI No. 3901, which uses "substantial factor" language.[3]

Davis contends he is entitled to a new trial because the jury was improperly instructed that he had to prove Murphy's negligence was a substantial factor in causing his harm. He asserts, "The substantial factor instruction was misleading based on the evidence in the record because there was no evidence that plaintiff was not harmed and no evidence that he would have suffered the same injury in the absence of defendant's negligence."

Davis did *not* object to CACI No. 424, the instruction requiring him to prove Murphy's negligence was a substantial factor in causing his injury. The court asked Davis's counsel, "Are you opposing [CACI No.] 424, negligence not contested . . . ?" He replied, "No, I am not opposing that." Acquiescence waives the right to challenge an instruction on appeal. (*Electronic Equipment Express, Inc. v. Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 856–857 (*Seiler*).)

The court said the parties "jointly agreed upon" and requested CACI No. 424 and "both parties have requested CACI 3901," which uses substantial factor language. " 'It is an

---

[3] The instruction read: "If you decide that Stan Davis was harmed and that Carol Murphy's negligence *was a substantial factor in causing that harm*, you must also decide how much money will reasonably compensate Stan Davis for the harm. This compensation is called damages." (Italics added.) It lists economic damages claimed by Davis (past and future lost earnings) and noneconomic damages (past and future physical pain, mental suffering, loss of enjoyment of life, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress).

9

elementary principle of appellate law that "[a] party may not complain of the giving of instructions which he has requested. [Citations.]" ' 'The invited error doctrine applies "with particular force in the area of jury instructions." ' " (*Mayes v. Bryan* (2006) 139 Cal.App.4th 1075, 1090.) "An examination of the record in this case reveals that [defendant], as well as [plaintiff] sought the instructions about which it now complains." (*Fortman v. Hemco* (1989) 211 Cal.App.3d 241, 255.) If the court erred by giving CACI Nos. 424 and 3901, Davis invited the error and is barred from raising it on appeal. (*Mayes*, at p. 1091.)

Davis objects to CACI No. 430, which defines "substantial factor." It is one of the "standard negligence instructions applicable to a motor vehicle accident." (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1318.) It subsumes the "but for" test of causation. (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1240; *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052; "Directions for Use" following CACI No. 430.) The trial court asked, "How could I give [CACI No.] 424, the liability not contested instruction, without giving the substantial factor instruction [CACI No. 430] that defines a phrase in [CACI No.] 424?" The court was correct.

"The court's use of CACI No. 430 to instruct the jury regarding the substantial factor standard for causation was appropriate and accurately stated the applicable legal principle. . . . [¶] Whether a defendant's conduct actually caused an injury is a question of fact [citation] that is ordinarily for the jury." (*Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 744.)

CACI No. 430 states that Murphy's negligence "does not have to be the only cause of the harm" as long as it is a nontrivial factor causing Davis's post-accident pain and losses. This was

10

particularly important given medical testimony that Davis had a torn rotator cuff for years before the collision. A tortfeasor in a rear-end collision may be liable if the effect of his negligence is to aggravate a preexisting condition, and plaintiff may recover to the full extent his condition was worsened by the defendant's act. (*Ng v. Hudson* (1977) 75 Cal.App.3d 250, 255, disapproved on another ground in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) Despite Davis's preexisting condition, the instruction enabled him to argue that the crash was a substantial (i.e., nontrivial) factor that aggravated his shoulder problem.

Davis goes astray in asserting that causation is an issue of law, not a question of fact for the jury. Whether or not a defendant's act is a substantial factor in bringing about a plaintiff's injury is a question of fact for the jury. (*Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 288.) The jury assessed witness credibility. Davis plainly testified that he was hurt in the collision, but the jury apparently did not believe him. The doctors testified that Davis's X-rays and scans revealed no fractures or dislocations. Dr. Fait opined that the accident did not make a chronically torn rotator cuff symptomatic. Though Davis reported pain, dizziness, and anxiety after the crash, these are subjective maladies reliant on the credibility of the person reporting them. If the jury did not believe Davis, it would not have credited his reports of discomfort.

Davis objects to the word "substantial" in the substantial factor rule. He argues that "substantial" is defined by dictionary as something big. By contrast, "substantial" as used by our Supreme Court "require[es] only that the contribution of the individual cause be more than negligible or theoretical."

11

(*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 978.) Even "a very minor force that does cause harm is a substantial factor." (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79.) However, " 'a force which plays only an "infinitesimal" or "theoretical" part in bringing about [the] injury . . . is not a substantial factor.' " (*Ibid.*)

Davis speculates that the jury used a dictionary definition of substantial ("big") and ignored the definition of substantial in CACI No. 430 ("more than remote or trivial"). The jury was instructed, "Do not use dictionaries" and "follow the law exactly as I give it to you, even if you disagree with it." We must presume the jury followed the instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 453.)

Davis asks us to rewrite the causation instructions. As given, however, they are the standard approved by our Supreme Court in *Mitchell v. Gonzales, supra,* 54 Cal.3d at page 1052 [" 'it appears impossible to improve on the . . . "substantial factor [test]." ' "] " 'California has definitively adopted the substantial factor test . . . for cause-in-fact determinations.' " (*Viner v. Sweet*, *supra,* 30 Cal.4th at p. 1239.) Davis was not prejudiced when the court gave the "substantial factor" instructions.

## 2. Sufficiency of the Evidence

As plaintiff, Davis had the burden of production and persuasion to support his claim for relief. When factual findings made at trial are attacked, " 'the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' " (*Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503.) We neither reweigh

evidence nor judge witness credibility. (*Seiler, supra,* 122 Cal.App.3d at p. 849.)

We defer to the jury's resolution of factual issues. Jurors have the benefit of observing the witnesses and are thus better situated than an appellate court to assess credibility. In deciding if a witness is truthful, jurors may consider his demeanor, the character of his testimony, his ability to recollect, bias, interest, motive, prior inconsistent statements, and the existence or nonexistence of any fact testified to by him. (Evid. Code, § 780.)

Plaintiff's counsel argued to the jury, "Either this is one big, huge ruse and this man concocted this whole farce or he's telling the truth. These are the two options. It's an all or nothing." The jury chose option one: It simply did not believe Davis.

Even if we were to disagree with the jury's sentiments, we cannot disturb them. The jury confronted inconsistent or unsupported claims about Davis's income; his testimony that he never previously suffered back pain or anxiety was contradicted by his 2013–2014 Kaiser medical records; there was evidence he had advanced degenerative conditions that preexisted the accident; his claims that he can no longer swim or exercise were contradicted by 2016 medical records reporting that he swims and exercises daily; his claims that he never asked a doctor for a "time off work" authorization were contradicted by his doctor; and Davis requested over $1 million in compensation despite little visible damage to his van.

The jury heard the testimony, looked at the evidence and resolved the dispute against Davis. "All of [Davis's] claims rested solely on the believability of [his] subjective, uncorroborated testimony that the accident caused [him] personal injury.

Because of the impeachment of [his] credibility, the jury reasonably rejected [his] claims." (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446 [after defendant stipulated to negligence in a car accident, the jury found in his favor despite plaintiff's unrefuted testimony that she suffered pain and sought medical treatment].)  The jury could " 'disregard all of the testimony of a party, whether contradicted or uncontradicted, if it determines that [he] testified falsely' [and] may conclude that a plaintiff who testifies falsely concerning injuries suffered no injuries." (*Id.* at p. 455.)  We cannot indulge Davis's request to nullify the verdict.

### 3.  Admission of Evidence

The defense proffered photographic evidence showing the condition of the parties' vehicles after the crash.  Over Davis's objection that the evidence was irrelevant, the court admitted the photos, reasoning that damage to the vehicles shows a likelihood that the collision caused physical trauma.  We review the ruling for an abuse of discretion.  (*Akers v. Miller* (1998) 68 Cal.App.4th 1143, 1147.)  In ruling on the admissibility of photographs, the court enjoys broad discretion in deciding whether prejudice substantially outweighs probative value.  (*People v. Michaels* (2002), 28 Cal. 4th 486, 532.)

Davis argues, "[T]he vehicle photographs that were admitted into evidence had virtually no probative value because the only damages Davis sought were past and future wage loss and . . . pain and suffering."  He notes that no biomechanical expert testified to advise the jury how the amount of vehicle damage correlates to his level of bodily injury.

No expert foundational testimony is required "before a jury can view photographs of vehicles involved in a collision.  This is because a jury is ordinarily quite capable of correlating outward

14

appearance of damage with likelihood and extent of injury." (*Christ v. Schwartz, supra,* 2 Cal.App.5th at p. 450.)  The photos are relevant even if the defendants "admitted liability and they did not claim property damage;" they are "probative to show the force of the collision, which is an indicator of injury or lack thereof to passengers in the autos."  (*Ibid.*)

Davis testified that Murphy struck him at "extremely high speed," causing pain and inability to work or exercise years after the crash.  The photos were relevant to prove the substantiality of the impact.  The jurors could infer that the minor damage to his vehicle meant it was not a high-speed crash, casting doubt on the injuries claimed to have resulted from it.

The court did not abuse its discretion by determining that the probative value of the photos outweighed the probability that they created a substantial danger of prejudicing Davis or confusing or misleading the jury.  (Evid. Code, § 352.)  Admission of the photos was not arbitrary, capricious, or patently absurd, nor did it result in a manifest miscarriage of justice.  (*People v. Yovanov* (1999) 69 Cal.App.4th 392, 406.)

## DISPOSITION

The judgment is affirmed.  As the prevailing party on appeal, respondent is entitled to recover her costs from appellant.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



CHAVEZ, J.



HOFFSTADT, J.