Filed 8/26/16  Garcia v. 23 Bottles of Beer CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| MARILYN GARCIA,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>23 BOTTLES OF BEER, LLC et al.,<br><br>        Defendants and Respondents. | A143393<br><br>(Sonoma County<br>Super. Ct. No. SVC-253914) |

        This appeal arises out of a suit brought by a restaurant patron against a pub and its bouncer about an incident that occurred on a September evening in 2011.  Plaintiff Marilyn Garcia, along with some friends, was at a pub owned by defendant 23 Bottles of Beer, LLC (23 Bottles).  While she was using the women's restroom, a man crawled from under an adjacent stall and looked up at her as she was urinating.  She screamed, the intruder attempted to leave, and she tried to detain him, following him out of the women's restroom.  As the two struggled, he exited the back door of the pub.  In the ensuing commotion, the pub's bouncer, defendant Anthony Helwick, ran after and grabbed the intruder.  According to plaintiff, he and another pub bouncer, Nick Atchison, together promised to call the police and hold the intruder until they arrived.  Instead, however, while she recovered elsewhere in the pub, they decided not to call the police and let the intruder go.

        Plaintiff asserted negligence and emotional distress claims against defendants based on two negligence theories.  First, she contended defendants were liable for failing to protect her from a reasonably foreseeable event, given that they knew that a man had

1

intruded into a stall being used by defendant Helwick's wife in the same restroom six months earlier. Second, defendants (with the two bouncers' promises and actions imputed to 23 Bottles) were negligent in voluntarily undertaking, and then failing, to call the police and to detain the intruder until police arrived.

Plaintiff appeals from the trial court's ruling granting summary judgment to defendants. Even if we assume plaintiff is correct in all of her arguments about the trial court's treatment of the evidence, we conclude that defendants were entitled to summary judgment. Regarding her premises liability claim, even accepting as true that defendants were aware of the prior incident, the circumstances do not establish that incident alone made another similar incident sufficiently foreseeable to require defendants to do more than they were already doing to protect female patrons using the pub's restroom. Regarding plaintiff's voluntary undertaking claim, the circumstances here do not support imposition of the duty plaintiff seeks to impose on defendants to physically restrain the intruder, and plaintiff has failed to demonstrate any injury from defendants' failure to call 911. We therefore affirm the judgment.

## BACKGROUND

### I.

### *Plaintiff's Complaint*

Plaintiff filed a complaint for damages alleging four causes of action: negligence–premises liability; negligence; negligent infliction of emotional distress; and intentional infliction of emotional distress against the 23 Bottles and Helwick (defendants) and Atchison, who is not a party to this appeal. Plaintiff alleged that prior to the September 5, 2011 incident at the pub, Helwick's wife, Aura Helwick, was in the pub's women's restroom when a man, Liam Atkins, crawled into her stall from an adjacent stall and observed her urinating. Atkins was a Sonoma County resident with an extensive criminal history, including convictions for various sex crimes, and was a registered sex offender. He left the restroom before Ms. Helwick could confront him. She informed the pub's security, including her husband, but declined to call the police. This incident occurred

2

several months before September 5, 2011, when Atkins did the same to plaintiff while she used the same restroom.

Plaintiff further alleged that after her incident occurred, another bouncer for the pub, Atchison, assured her he would call the police, but instead gave Helwick, who was holding Atkins, a contrived explanation about the events that took place, vouched for Atkins, assisted Helwick in releasing Atkins, and fled the scene before the police arrived. "Atkins was arrested the following day at Santa Rosa Junior College campus for similar acts (i.e., entering a women's restroom), but [plaintiff] did not know the disposition of Atkins for several days and believed he remained at large."

According to plaintiff, "the events that led to the harm suffered by [plaintiff] were entirely foreseeable by Defendants as similar if not identical instances had occurred several months prior by the same person in the same women's restroom at the same premises being operated by [23 Bottles]." Defendants knew that similar conduct had occurred and could have prevented it from happening again by taking a variety of protective measures, which they failed to do.

Plaintiff further alleged that, besides failing to take these protective measures, defendants "voluntarily undertook to render services to [plaintiff] by taking Atkins into custody until the police arrived and promising to call the police, which they did not do until after Atkins was released from defendants' custody and detention." Plaintiff "relied on the actions and promise of defendants to maintain custody of Atkins until the police arrive[d] and also to call the police."

## II.

### *Summary Judgment Proceedings*

In March 2014, defendants moved for summary judgment. They acknowledged the prior incident at the pub involving defendant Helwick's wife had occurred, but provided declarations by the pub's owner and managers stating they did not have notice of it before the incident with plaintiff occurred. They provided a declaration by Aura Helwick attesting that six months before plaintiff's incident, a male intruded on her as she urinated in a stall in the pub's women's restroom, spying on her after crawling from

3

underneath an adjacent stall. She was "startled" and "screamed." The intruder ran away. She told her husband it had happened "very quickly," she did not "have a chance to look at the suspect carefully, or for long enough time to be able to describe him to the police, or anyone else," and she asked her husband not to report it to anyone. She was "not harmed in any manner by [the] incident." She did not report the incident to the pub's managers or owners or to police before September 5, 2011. Defendant Helwick attested that his wife told him about the incident, but that he did not notify the pub owners or managers about it or report it to police before September 5, 2011.

Helwick also attested that he did not intentionally release Atkins, after Atkins intruded on plaintiff the evening of September 5, 2011. Rather, Helwick released Atkins because he was not struggling, but directed Atkins to stay "until we figure out what happened." Atkins instead ran away. According to Helwick, Atkins said he was drunk, entered the women's restroom by mistake and fell down in the bathroom stall.

Defendants argued that given the various security measures they had already implemented, there was an insufficient connection between their conduct and plaintiff's injury to impose premises liability on them. They contended they were not liable under plaintiff's negligent voluntary undertaking theory because she could not show reliance or injury resulting from their alleged failure to restrain Atkins or call 911.[1]

In her opposition, plaintiff disputed various facts. She disputed the pub managers' declarations stating they were unaware of the prior incident involving Aura Helwick, providing her own declaration and excerpts from her deposition indicating the pub's manager told her about that prior incident on the evening that she was accosted by Atkins.[2] She argued that the prior incident made Atkins' intrusion on her foreseeable. The adequacy of the measures defendants undertook, she contended, was an issue of fact

---

[1] Defendants argued that plaintiff's negligent and intentional infliction of emotional distress claims turned on the same issue of duty, breach and proximate cause as her other claims. Plaintiff did not argue otherwise.

[2] Plaintiff testified that a pub manager told her "that about six months before, the bouncer's [Helwick's] wife had had the exact same thing happen to her." Plaintiff made a similar statement in her declaration.

4

for the jury. She also disputed Helwick's statement that Atkins got away, citing evidence of the pub manager's apology to her on the evening of the incident, his statements that Atchison had "vouched" for Atkins and that what happened was a "mistake," and his statement that Helwick had released Atkins as a result. She also cited a police officer's deposition testimony that Helwick admitted he had released the intruder because Atchison had vouched for him. She argued there were triable issues concerning Helwick's negligent discharge of his duties, including his willful failure to report a prior crime, failure to watch the women's restroom, failure to intercede when he saw the physical altercation taking place, and failure to monitor the security cameras. She argued 23 Bottles was vicariously liable for Helwick's and Atchison's acts of vouching for and releasing Atkins and failing to call 911. Plaintiff contended her damages included emotional distress that "kept her in counseling for over a year and put her on anti-anxiety medications," and resulted in nausea, heart palpitations, anxiety and nightmares. Both the incident and defendants' subsequent release of the perpetrator and failure to call 911 caused her to suffer this distress.

In reply, defendants argued Helwick's knowledge of the prior incident involving his wife could not be imputed to 23 Bottles of Beer, LLC and made various evidentiary objections.

The trial court sustained a number of defendants' evidentiary objections and granted their motion for summary judgment. It rejected plaintiff's premises liability theory because plaintiff "present[ed] no *admissible* evidence to support her assertion that any Defendant had notice of the alleged prior incident upon which she argues foreseeability," and found insufficient notice to create a duty on defendants to increase security efforts.

The trial court also rejected plaintiff's theory that defendants breached a duty they undertook to call 911: "There is insufficient evidence presented which distinguishes damages from these allegations as compared with the natural detrimental consequences of the events occurring in the restroom. There is no evidence of injury proximately

5

caused by this conduct. Further, there is no evidence that a failure to call 9-1-1 by a Defendant was a proximate cause of any of Plaintiff's injuries."

Plaintiff filed a timely notice of appeal.

## DISCUSSION

Plaintiff asserted in her complaint that defendants were negligent in failing to take certain steps to prevent someone like Atkins intruding into the women's restroom at the pub and that Helwick and Atchison were negligent (and 23 Bottles is vicariously liable for their negligence) in releasing Atkins and failing to call the police.

Plaintiff argues on appeal, among other things, that the court erred in granting summary judgment because defendants did not meet their burden to establish a prima facie showing that there are no triable issues of fact regarding foreseeability and damages and did not demonstrate the absence of triable issues as to whether their failures to detain the perpetrator, Atkins, and to call 911, proximately caused her any damages. Further, according to plaintiff, even if defendants met their initial burden, she raised material triable issues of fact in her opposition. We disagree.

As we discuss below, we consider all of the evidence, including that as to which the trial court sustained objections. We assume, for purposes of this appeal, that plaintiff is correct in arguing the trial court erred by excluding her evidence. We also assume that plaintiff's evidence demonstrated, or at least raised a triable issue regarding, defendants' knowledge of the prior incident and that Atchison vouched for Atkins and Helwick intentionally released Atkins. Finally, we accept without deciding, for purposes of this appeal, plaintiff's arguments that 23 Bottles was vicariously liable for Helwick's and Atchison's actions. We conclude that even if all of these issues were resolved in plaintiff's favor, as a matter of law she cannot establish that defendants had the duties on which her claims are based.[3]

---

[3] The parties extensively debate these issues. We need not resolve any of them because we conclude that, even assuming for the sake of argument that plaintiff is correct about all of them, the trial court properly granted defendants' motion for summary judgment. Therefore, we do not discuss these issues further.

6

# I.

## *Standard of Review*

" ' "A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. [Citations.] The moving [defendant] bears the burden of showing the court that the plaintiff 'has not established, and cannot reasonably expect to establish,' " the elements of his or her cause of action' " (*State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017), " 'or that there is a complete defense.' " (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 (*Aguilar*).) If the defendant satisfies this burden, " 'the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.' " (*Ibid.*)

"In ruling on the motion [for summary judgment], the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom ([Code Civ. Proc.,] § 437c, subd. (c)), and must view such evidence [citations] and such inferences [citations] in the light most favorable to the opposing party." (*Aguilar*, *supra*, 25 Cal.4th at p. 843.) It may not " 'grant[]' the defendants' motion for summary judgment 'based on inferences . . . , if contradicted by other inferences or evidence, which raise a triable issue as to any material fact.' (Code Civ. Proc., § 437c, subd. (c).) Neither, apparently, may the court grant their motion based on any evidence from which such inferences are drawn, if so contradicted. That means that, if the court concludes that the plaintiff's evidence or inferences raise a triable issue of material fact, it must conclude its consideration and deny the defendants' motion." (*Id.* at p. 856.)

On appeal, we review an order of summary judgment de novo. (*Aguilar*, *supra*, 25 Cal.4th at p. 860.) "We consider only the facts that were properly before the trial court when it ruled on the motion and apply the same three-step analysis as the trial court: first we ' "identify the issues framed by the pleadings" '; next we ' "determine whether the moving party's showing has satisfied his burden of proof and justifies a judgment in movant's favor" '; and finally we ' "determine whether the opposition demonstrates the existence of a triable issue of material fact." ' [Citations.] In doing so, we liberally

7

construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1449.) We "affirm the judgment of the trial court if it is correct on any theory of law applicable to the case, including but not limited to the theory adopted by the trial court. [Citations.] Thus, we must affirm so long as any of the grounds urged by [defendants], either here or in the trial court, entitles [them] to summary judgment." (*Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1481.)

## II.

### *The Summary Judgment Rulings*

Both plaintiff's premises liability and voluntary undertaking claims are rooted in theories of negligence. Therefore, to prevail on each claim, plaintiff must establish "that the defendant[s] owed [her] a legal duty, that the defendant[s] breached the duty, and that the breach was a proximate or legal cause of injuries suffered by [her]." (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 (*Ann M.*), disapproved on another ground in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527, fn. 5.)

Defendants' motion was based in significant part on their contention that plaintiff could not establish the duty element of her negligence claims. "The existence of a duty is a question of law for the court." (*Ann M.*, *supra*, 6 Cal.4th at p. 674.) Foreseeability, which "is a crucial factor in determining the existence of a duty" (*id.* at p. 676), is also "a question of law to be decided by the court." (*Id.* at p. 678.) Accordingly, we determine de novo whether the events that caused plaintiff harm were foreseeable, whether they were sufficiently foreseeable to impose duties on defendants, and finally the scope of such duties. (See *ibid.*)

"[A]s a general matter, there is no duty to act to protect others from the conduct of third parties." (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235 (*Delgado*).) But there are exceptions to that rule (*ibid.*), two of which plaintiff has invoked. The first is the "special relationship" exception, under which "[a] defendant may owe an affirmative duty to protect another from the conduct of third parties if he or she has a 'special

8

relationship' with the other person." (*Ibid.*) Plaintiff bases her premises liability claim on this special duty, and argues defendants failed to meet their initial burden as summary judgment movants to refute they had it. She contends they failed to demonstrate the absence of triable issues of fact material on foreseeability, and that she presented evidence raising triable issues of fact regarding this duty.

The second exception is for a voluntary undertaking. It posits that "a volunteer who, having no initial duty to do so, undertakes to provide protective services to another, will be found to have a duty to exercise due care in the performance of that undertaking if one of two conditions is met: either (a) the volunteer's failure to exercise such care increases the risk of harm to the other person, or (b) the other person reasonably relies upon the volunteer's undertaking and suffers injury as a result." (*Delgado*, *supra*, 36 Cal.4th at p. 249.) Plaintiff contends she presented evidence raising triable issues of fact regarding defendants' assumption of this duty.

Defendants were entitled to summary judgment if they demonstrated that under no hypothesis was there a triable material issue of fact regarding defendants' duty under each of plaintiff's negligence theories. (See *Ann M.*, *supra*, 6 Cal.4th at pp. 673–674.) If plaintiff is correct that they did not do so for either theory, we must reverse. (See *Miles Laboratories, Inc. v. Superior Court* (1982) 133 Cal.App.3d 587, 593 [defendant moving for summary judgment has burden of negating the existence of all causes of action on all theories embodied in the complaint, and if he fails motion must be denied].)

**A. *The Law Governing the Premises Liability Theory of Negligence***

"Courts have found . . . a special relationship in cases involving the relationship between business proprietors such as . . . restaurants, and bars, and their . . . patrons, or invitees." (*Delgado*, *supra*, 36 Cal.4th at p. 235.) This includes " 'the duty to take reasonable steps to secure common areas against foreseeable criminal acts of third parties that are likely to occur in the absence of such precautionary measures.' " (*Ibid.*, italics omitted.) In determining the scope of this duty, the court must engage in a "balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures." (*Ann M.*, *supra*, 6 Cal.4th at pp. 678–679.)

9

" ' " '[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required.' " ' " (*Delgado*, at p. 238.)

Thus, on one end of the spectrum are measures such as providing assistance to customers who become ill or need medical attention, telephoning the police or 911 for assistance or having existing security personnel escort patrons to a car in a nearby parking lot. (See *Delgado*, *supra*, 36 Cal.4th at p. 241.) These not very burdensome duties may apply to businesses that would not be required to undertake more burdensome measures, such as providing a security guard, ensuring a parking garage is brightly lit, activating and monitoring previously installed security cameras, and requiring existing personnel to walk periodically through the garage. (*Id*. at pp. 239–241; see *Vasquez v. Residential Investments, Inc*. (2004) 118 Cal.App.4th 269, 286 (*Vasquez* ) [high degree of foreseeability is not required to impose minimally burdensome measures].) Measures of the more burdensome kind require a "heightened" degree of foreseeability that will rarely be met in the absence of any prior similar incidents on the premises or at similar business premises that are nearby. (*Delgado*, at pp. 239–240 & fn. 19.)

Further, in determining whether a proprietor has a duty to a patron, factors to consider in addition to foreseeability, known as the "*Rowland* factors," are "the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland v. Christian* (1968) 69 Cal.2d 108, 113 (*Rowland*), partially superseded by statute on another ground as stated in *Cavillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 722; see *Delgado*, *supra*, 36 Cal.4th at pp. 237 & fn. 15, 246.)

*Delgado* is instructive on how to analyze the scope of a business proprietor's duty to its patrons to prevent injury from criminal acts of third parties. In that case, the

10

plaintiff, Delgado, was assaulted by third parties in the parking lot of the defendant, Trax Bar & Grill. (*Delgado*, *supra*, 36 Cal.4th at pp. 229, 232.) Delgado and his wife were patrons of the bar. (*Id*. at p. 230.) After a group sitting near them stared at Delgado repeatedly, he became uncomfortable and decided to leave. (*Id*. at p. 231.) Delgado's wife approached a guard employed by the bar, who then observed the hostile stares and shared her concern that a fight was imminent. (*Ibid*.) The guard asked Delgado and his wife to leave but did not escort them to their car in the parking lot. (*Ibid*.) As they left the restaurant and walked across the lot to their car, the guard employed by the bar to patrol the parking lot was not present. (*Ibid*.) A group of between 12 and 20 men standing in the parking lot, joined by the group that had been staring at Delgado inside the bar, brutally assaulted Delgado, fracturing his skull and causing other serious injuries. (*Id*. at pp. 231–232 & fn. 6.) A jury found the defendant negligent and awarded Delgado damages of about $80,000. (*Id*. at p. 233.)

The defendant appealed, "contending that because there was no evidence of prior similar criminal assaults either on its premises or in the vicinity, the assault upon [Delgado] was unforeseeable as a matter of law, and that as a consequence it owed no duty to provide a security guard and thus could not be held liable for [Delgado's] injuries." (*Delgado*, *supra*, 36 Cal.4th at p. 233.) The court concluded Delgado had "produced insufficient evidence of heightened foreseeability in the form of prior similar incidents or other indications of a reasonably foreseeable risk of a violent criminal assault on defendant's premises that would have imposed upon defendant an obligation to provide any guard, or additional guards, to protect against third party assaults." (*Id*. at p. 245.) However, this did not mean "that defendant owed no *other* special-relationship-based duty to [Delgado], such as a duty to respond to events unfolding in its presence by undertaking reasonable, relatively simple, and minimally burdensome measures." (*Ibid*.) Defendant's guard inside the bar with whom Delgado's wife had spoken "was aware of facts that led him to conclude . . . that a fight was likely to occur" between the group of staring men and Delgado absent their separation. (*Ibid*.) Such knowledge provided a degree of foreseeability that, coupled with the other *Rowland* factors, "support[ed] a

11

determination that defendant had a special-relationship-based duty to respond to the unfolding events by taking reasonable, relatively simple, and minimally burdensome steps in order to address the imminent danger that [the guard inside the bar] perceived." (*Id.* at p. 246.) Such measures included attempting to dissuade the group inside the bar from following Delgado and his wife outside and, failing that, confirming that the outside guard was at his post in the parking lot and available to help keep Delgado and his wife separated from the group. (*Id*. at pp. 246–247.)

In regard to the *Rowland* factors, the court observed that " '[t]he most important of these considerations in establishing a duty is foreseeability.' " (*Delgado*, *supra*, 36 Cal. 4th at p. 237, fn. 15.) The other *Rowland* factors " 'may dictate against expanding the scope of a landowner's duty to include protecting against third party crime, even where there is sufficient evidence of foreseeability.' " (*Ibid*.)

*Vasquez v. Residential Investments, Inc.*, *supra*, 118 Cal.App.4th at p. 280 is another instructive case, albeit in the landlord-tenant context. There, the appellate court stated that "the question of a landlord's duty is *not* whether a duty exists *at all,* but rather what is the *scope* of the landlord's duty given the particular facts of the case? Our reference to the *scope* of the landlord's duty is intended to describe the specific steps a landlord must take in a given specific circumstance to maintain the property's safety to protect a tenant from a specific class of risk. It is this question that we decide as a matter of law. [¶] When a court strives to answer this question, we believe it should limit its inquiry to the specific action the plaintiff claims the particular landlord had a duty to undertake in the particular case." (*Ibid*.)

*Vasquez* outlined the analytical process in this way: "First, the court must determine the specific measures the plaintiff asserts the defendant should have taken to prevent the harm. This frames the issue for the court's determination by defining the scope of the duty under consideration. Second, the court must analyze how financially and socially burdensome these proposed measures would be to a landlord, which measures could range from minimally burdensome to significantly burdensome under the facts of the case. Third, the court must identify the nature of the third party conduct that

12

the plaintiff claims could have been prevented had the landlord taken the proposed measures, and assess how foreseeable (on a continuum from a mere possibility to a reasonable probability) it was that this conduct would occur. Once the burden and foreseeability have been independently assessed, they can be compared in determining the scope of the duty the court imposes on a given defendant. The more certain the likelihood of harm, the higher the burden a court will impose on a landlord to prevent it; the less foreseeable the harm, the lower the burden a court will place on a landlord." (*Vasquez*, *supra*, 118 Cal.App.4th. at p. 285, fn. omitted.) Our Supreme Court adopted the *Vasquez* analytical approach in *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214 (*Castaneda*). We follow it here.

## B. *Defendants Were Entitled to Summary Judgment on Plaintiff's Premises Liability Claim.*

In her complaint plaintiff alleged that defendants should have taken a number of measures to prevent assaults by men on women using the pub's women's restroom. These included maintaining adequate security on the premises; training security related to male subjects entering the women's restroom; having security observe the women's restroom to determine if male subjects were attempting to enter it; installing or maintaining live video cameras in front of the women's restroom to observe any potential criminal activity; repositioning security near the restrooms; placing additional lighting in the restroom area; implementing frequent inspections of the area near the restrooms; requesting that the police make frequent patrols around the premises; and warning patrons of the risks of harm.

In their summary judgment motion, defendants presented evidence that 23 Bottles had already undertaken to do many of these things at the time plaintiff's incident occurred. As of that night, the light was on in the restroom and plaintiff was able to see Atkins's shadow before his face appeared under the stall; the pub's surveillance system was functional and had six cameras, one of which was located "in the rear of the restaurant, overseeing [*sic*] the public restrooms and the back doors"; the cameras were connected to a closed-circuit video-surveillance system installed at a cost of $25,000

13

which recorded daily activity in and around the pub and captured the incident; the pub's owners and some managers were trained on how to locate video footage, and the owners were able to view the footage, both on site at the pub on the managers' computers and remotely from an office located off site; one of the pub's two owners reviewed the surveillance tape and saw "a man, who [she] later learned was Liam Atkins, entering the Pub through the back doors, going straight into the men's restroom, but immediately coming back out and sneaking into the women's bathroom"; 23 Bottles employed two bouncers, one of whom, defendant Helwick, was on duty on the night of plaintiff's incident; the pub's bouncers were experienced in security and required to patrol outside the pub to ensure persons do not congregate or consume alcoholic beverages there, patrol the inside of the pub to ensure the safety of patrons, ensure patrons do not become intoxicated or engage in physical or verbal altercations and remove those who engage in such altercations or any attack. Further, Santa Rosa police officers "periodically patrol[led] the [pub] at the [pub's] sole expense." Also, defendants' declarations attested that "[w]hile verbal or physical altercations may have occurred at the Pub between patrons in the past," "[t]here had been no prior violent criminal assaults on the premises."

Defendants argued that having the bouncer monitor the entrance to the women's restroom would prevent him from carrying out his other responsibilities, jeopardizing the safety of other patrons, and that employing a single bouncer just to monitor the restrooms was "not warranted or reasonable under the circumstances." Defendants also argued that "[h]iring an additional full-time employee would be a substantial burden on the restaurant. Having the video cameras monitored constantly would also be a significant burden as the restaurant would necessarily have to employ a full-time person solely for this purpose." Regarding plaintiff's allegation that the restroom area should have been better lit, defendants pointed to plaintiff's testimony that she was able to see Atkins's shadow under the stall, and argued it was "speculation to suggest brighter lighting would have deterred the peeping." They argued this was also true regarding plaintiff's allegation that there should have been more frequent police patrols because even if the

14

police had patrolled that evening "Atkins could have just waited for the officers to leave" before sneaking into the bathroom.

Regarding plaintiff's allegation that defendants should have warned patrons of the prior incident, defendants argued that "it would be unreasonable to require them to warn [plaintiff] that an unidentified man might enter the restroom to peep on her simply because an incident happened six months before."[4] They also argued that "posting a warning on the Women's Restroom about the risk of a peeping Tom would be certain to ruin the business." Defendants did not specifically address plaintiff's allegation that they should have trained security about male subjects entering the women's restroom.

In her opposition, plaintiff contended that 23 Bottles had a duty to protect her. She also contended that whether the security measures it took were adequate—or whether it should instead have monitored the entrance to the restrooms by repositioning a bouncer nearby or watching the video to make sure men were not trying to enter the women's restroom—was a question of fact for the jury. She makes the same argument on appeal, citing *Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 131. *Isaacs* states that whether the security measures undertaken by a defendant were adequate under the circumstances is a jury question, but in subsequent cases the California Supreme Court has held that, at least where the facts are not in dispute, the existence *and the scope* of the duty owed by a premises owner are questions of law that this court reviews de novo. (*Ann M.*, *supra*, 6 Cal.4th at p. 674 [appellate court reviews issues of existence and scope of duty de novo]; *Verdugo v. Target Corp.* (2014) 59 Cal.4th 312, 338–343 [holding as a matter of law that retailer's common law duty of reasonable care to patrons did not include obligation to acquire and make available automatic external defibrillators]; see also *Vasquez*, *supra*, 118 Cal.App.4th at p. 280 ["Our reference to the *scope* of the landlord's duty is intended to describe the specific steps a landlord must take in a given specific circumstance to maintain the property's safety to protect a tenant from a specific

---

[4] As we have discussed, defendants denied actual knowledge of this prior incident, but we have assumed for the sake of argument that plaintiff's evidence demonstrates their knowledge and is admissible in resolving this appeal.

15

class of risk. It is this question that we decide as a matter of law"].) And, as we have indicated, in *Castaneda*, the court adopted an approach to analyzing the scope of a premises owner's duty that entails applying a balancing test to each of the measures the plaintiff posits should have been taken by the defendant. (*Castaneda*, *supra*, 41 Cal.4th at pp. 1214–1215 [scope of duty is determined by balancing foreseeability against burden; court must identify specific action(s) plaintiff claims defendant had duty to undertake and then undertake balancing analysis to determine whether the specific obligations should or should not be imposed].)

Defendants argue that knowledge of a single prior incident is insufficient to establish foreseeability as a matter of law, while plaintiff argues it can be sufficient, particularly here when the incidents are nearly identical. We decline to adopt a general rule that a single prior incident can never provide a sufficient degree of foreseeability to impose any duty on any proprietor in any circumstances, or that a single prior, nearly identical incident will always establish the requisite foreseeability. The case law indicates that the scope of duty depends on consideration of all of the circumstances. In particular, *Ann M.* and its progeny have held that the degree of foreseeability required to impose a duty to take preventive steps of a very modest kind is not the same as the degree of foreseeability required to impose a duty to undertake a heavier burden. (*Ann M.*, *supra*, 6 Cal.4th at pp. 678–679; *Delgado*, *supra*, 36 Cal.4th at p. 243 ["imposition of a high burden requires heightened foreseeability, but a minimal burden may be imposed upon a showing of a lesser degree"].) Rather than establish a general rule, we consider each of the preventive steps plaintiff alleged defendant should have taken, which include both substantial measures and more modest ones, pursuant to the three-step *Vasquez/Castaneda* analysis.

In the first step of this analysis, we determine what steps plaintiff alleges defendants should have taken, but did not take, to prevent the incident. Defendants offered evidence, which plaintiff did not dispute, that 23 Bottles took a number of measures, including some plaintiff alleged it should have taken, to protect patrons and invitees from potential harms. This includes hiring bouncers, requiring them to patrol

16

inside and outside the pub and to remove patrons who became intoxicated or engaged in physical or verbal altercations, installing and using surveillance cameras, including one overseeing the entrance to the restrooms, and paying for police officers to periodically conduct patrols inside and outside the pub. Unresolved by this evidence, however, is the question whether defendants had the other duties plaintiff has alleged, which are to: (a) monitor the restroom area constantly or more closely by repositioning a bouncer nearby, requiring frequent inspections of that area, or having a security employee observe the entrance or the video to make sure men were not trying to enter the women's restroom; (b) provide better lighting in the restroom area; (c) train security about male subjects entering the women's restroom; or (d) warn patrons of the risk of such an occurrence.

Turning to the second step of the *Vasquez/Castaneda* analysis, we consider "how financially and socially burdensome these proposed measures would be." (*Vasquez, supra*, 118 Cal.App.4th at p. 285.) The duty to constantly monitor the restroom area, as posited by plaintiff, would impose a substantial financial burden on 23 Bottles. To have such constant monitoring, as opposed to the patrolling inside and outside that 23 Bottles requires of its bouncer, would require 23 Bottles to hire and devote the time of an additional employee to constantly monitor the restroom entrance during business hours, since the pub's bouncer obviously could not have fulfilled the patrolling duties and constantly monitored the restroom area. As the court in *Ann M.*, recognized, the "monetary costs" of hiring security personnel are "not insignificant" and thus hiring security guards "will rarely, if ever, be found to be a 'minimal burden.' " (*Ann M.*, *supra*, 6 Cal.4th at p. 679.) Thus, "a high degree of foreseeability is required in order to find that the scope of [a restaurant's] duty of care includes the hiring of [a] security guard[]" or other employee for that purpose. (*Ibid*.; see also *Delgado*, *supra*, 36 Cal.4th at pp. 239–240 & fn. 19 [obligation to provide guards to protect patrons requires high degree of foreseeability]; *Sharon P. v. Arman, Ltd.*, 21 Cal.4th 1181, 1195–1196 (*Sharon P.*), overruled on another ground in *Reid v. Google*, *supra*, 50 Cal.4th 512; see also *Sharon P.* at p. 1191 [duty to have employee continuously monitor security video transmissions may be as burdensome as duty to hire security guards].)

17

Turning to the third step of the *Vasquez/Castaneda* analysis, we evaluate how foreseeable it was—"on a continuum from a mere possibility to a reasonable probability"—that an incident of sexual misconduct would occur in the women's restroom at the pub. (*Vasquez*, *supra*, 118 Cal.App.4th at p. 285; *Castaneda*, *supra*, 41 Cal.4th at p. 1214.) The only evidence plaintiff presented on this issue is the prior incident six months before involving Helwick's wife. Plaintiff did not provide any evidence of circumstances existing at the pub that might suggest this incident would be repeated, such as a pattern of excessive sexual conduct or drinking at the pub (cf. *Janice H. v. 696 North Robertson, LLC* (2016) 1 Cal.App.5th 586), repeated instances of inappropriate behavior by men towards women or of men loitering by the restroom, or that anyone knew the identity of or other facts about the intruder who committed the prior incident. This single incident six months earlier is simply insufficient by itself to establish a "high degree of foreseeability" that another such incident was likely to recur at the pub unless defendants constantly monitored the women's restroom area during business hours. Given the limited degree of foreseeability that there would be another incident of sexual misconduct in the women's restroom, and the financial burden to defendants to add an additional security guard or other employee to monitor the restrooms or the security cameras, we conclude defendants had no duty to provide such monitoring.

We now repeat the *Vasquez/Castaneda* analytical process for the other measures plaintiff claims defendants should have employed. These measures include providing better lighting in or near the restrooms, warning patrons of the risk of sexual assaults in the restroom, and training the pub's security staff about that risk. These measures are less burdensome than providing a guard or employee to monitor the restroom area at all times. Providing brighter lighting in a limited area, either along the hallway on which the restrooms were located or within the restrooms,[5] would pose a burden that, while not de

---

[5] The complaint refers to "additional lighting in the restroom area" without further specification.

18

minimis, is relatively modest, even for a small business like a restaurant or bar. Providing training to make staff aware of the prior incident and encourage them to be alert for men entering the women's restroom would pose a minimal burden as well. Posting a sign by the women's restroom would entail minimal effort and expense, although defendants suggested that posting such a warning would harm the pub's business. Given this lower level of burden, we need not apply a heightened standard of foreseeability, but instead will apply the " 'regular' reasonable foreseeability" test to determine whether defendants had a duty to take these less burdensome precautionary measures. (See *Delgado*, *supra*, 36 Cal.4th at p. 244, fn. 24.)

This "regular" test was articulated in *Ann M*. The court stated that business proprietors such as restaurants and bars have a "duty to take reasonable steps to secure common areas against foreseeable criminal acts of third parties *that are likely to occur in the absence of such precautionary measures*." (*Ann M.*, *supra*, 6 Cal.4th at p. 674, italics added.) *Ann M.* also described the duty of a landlord "to take affirmative action to control the wrongful acts of a third party" as limited to situations "where such conduct can be *reasonably anticipated*." (*Id*. at p. 676, italics added, quoted approvingly in *Delgado*, *supra*, 36 Cal.4th at p. 235; see also *Nicole M. v. Sears, Roebuck & Co.* (1999) 76 Cal.App.4th 1238, 1245 [" ' " 'whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct' " ' "; " 'more than a mere possibility of occurrence' " is required for creation of duty " 'since, through hindsight, everything is foreseeable' "].)

Thus, the question is whether defendants, assuming they had knowledge of the prior incident, "had reasonable cause to anticipate" that a sexual offender would intrude on women in the pub restroom unless they provided better lighting in the restroom area, warned female patrons to be on the lookout for peepers or sexual miscreants in the restroom or trained the pub's security staff to be alert for such persons. (See *Ann M.*, *supra*, 6 Cal.4th at p. 676.) In our view, the answer is no. For the reasons we have already discussed, a reasonable proprietor who had learned of the prior incident involving Aura Helwick would not—based on that information alone—have reason to expect the

19

same type of incident would occur again in the same location. Absent other circumstances, there would be no reason to anticipate a recurrence of that kind of incident at the pub or to believe it was more than merely possible.

Nor do any other factors weigh in favor of imposing a duty on defendants. Even if the prior incident made it minimally foreseeable that such an incident could happen again, we would be required to balance that consideration against the " ' "vagueness, and efficacy" of the proposed security measures.' " (*Delgado*, 36 Cal.4th at pp. 237–238.) Plaintiff's assertion that better lighting could have prevented the incident is hopelessly vague and incomplete. Plaintiff admitted that the bathroom lighting enabled her to see Atkins's shadow under the stall adjacent to her, and she does not explain why or how brighter lighting in the bathroom could have prevented the incident. Assuming she means there should have brighter lighting in the hallway on which the entrances to the restrooms were located, she presented no evidence that the existing lighting was insufficient; absent such evidence, it is speculative to suggest that without constant monitoring, a brighter hallway would have deterred Atkins or resulted in someone noticing his entry into the women's bathroom and taking steps to remove him before plaintiff entered. (See *Sharon P.*, *supra*, 21 Cal.4th at p. 1196 [observing criticism of view that " 'adequate lighting' is a simple and well-defined security measure that is effective in preventing crime-related injuries"].) The same is true of training. It is unclear from plaintiff's assertions what type of training could have prevented the incident if the bouncer was patrolling throughout the pub and not required to monitor the restroom entrances at all times. A posted "warning" is perhaps a little less vague, but would likely deter many women from using the restroom altogether and even patronizing the pub, both of which would be impractical, problematic and burdensome for obvious reasons.

Nor do the *Rowland* factors aid plaintiff. "[W]here only emotional distress is claimed, the degree of certainty that plaintiff suffered injury is diminished." (*Fluharty v. Fluharty* (1997) 59 Cal.App.4th 484, 495.) The connection between defendants' failure to take the less burdensome precautionary measures plaintiff proposes and her injury is, as already discussed, attenuated. Moral blame for failure to undertake these measures is

wanting, particularly given the evidence defendants offered regarding the protective measures they were already taking.

For all of these reasons, we conclude the trial court did not err in determining that defendants were entitled to summary judgment on plaintiff's premises liability claim.

## C. *Defendants Were Entitled to Summary Judgment on Plaintiff's Voluntary Undertaking Theory.*

Plaintiff also argues the trial court erred by granting defendants summary judgment on her negligent voluntary undertaking theory. Again, we disagree.

"[A] volunteer who, having no initial duty to do so, undertakes to provide protective services to another, will be found to have a duty to exercise due care in the performance of that undertaking if one of two conditions is met: either (a) the volunteer's failure to exercise such care increases the risk of harm to the other person, or (b) the other person reasonably relies upon the volunteer's undertaking and suffers injury as a result." (*Delgado*, *supra*, 36 Cal.4th at p. 249.) "[T]he scope of any duty assumed depends upon the nature of the undertaking." (*Ibid.*) Stated more plainly, "[t]he scope of any assumed duty must be measured by what respondent actually undertook to do." (*Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141, 163 (*Margaret W.*).) As with the proprietor-patron special relationship theory, if the other elements are established and the requisite degree of foreseeability exists, we then consider the *Rowland* factors in determining whether there is a duty. (See *Margaret W.*, at pp. 161–162.)

Plaintiff alleged defendants "voluntarily undertook to render services to [her] by taking Atkins into custody until the police arrived and promising to call the police." Plaintiff alleges that she relied on these actions and promises. She refrained from "call[ing] the police herself and continually observ[ing] Atkins so that he [could] be apprehended by the police department" and "was persuaded by the Defendants to re-enter the [pub] premises to inform other employees of the [pub] as to what had happened." As a result of defendants' negligence, "the person who attacked, assaulted and humiliated [plaintiff] was released prior to police arrival and [p]laintiff believed that the perpetrator of her attack remained at large." This theory of liability is different from plaintiff's

21

special relationship theory in that it is not about preventing the incident itself or the harm that flowed from it. Rather, plaintiff asserts defendants caused her additional emotional distress when, after promising to detain the perpetrator and call the police, they failed to do either.

Plaintiff presented evidence in her opposition to defendants' summary judgment motion that, on witnessing the fracas between her and Atkins in the area where the restrooms were located and seeing Atkins run out the back doors, defendant Helwick "gave chase and caught up with Atkins in the parking lot adjacent to the Pub," and "brought him back to the Pub" remaining outside by the back doors. Helwick asked plaintiff whether she wanted him to call the police, and she answered affirmatively. When another bar patron encouraged her to "go inside and calm down, because they had caught him, and they were calling the police and . . . everything would be okay," she asked repeatedly " 'What if they let him go?' " Helwick reassured her that they would not let Atkins go. When plaintiff later discovered that they had released Atkins and had not called the police she "became hysterical and started crying" and "was extremely distraught and upset." She overheard men saying "it was just a misunderstanding." Later, the pub's manager told her Atchison had "vouched for the man" and said "it was a mistake" and that Helwick then "let him go."

Plaintiff described the emotional distress she suffered from these acts as follows: "I beat myself up for trusting that they would hold the male subject while I was inside. I beat myself up for trusting that they would call the police. I still struggle to trust people and this incident has affected my relationships with others. . . . [¶] After learning he was let go, I was fearful that this unknown subject would find me or see me somewhere. I did not know if the act was random or I was specifically targeted. I worried that he would come after me again. . . . I feel guilty that I trusted [the pub] and feel guilty that my poor judgment that [the pub] would act responsibly led to another woman being assaulted."

Defendants did not dispute plaintiff's assertion that neither Helwick nor any other pub employee called the police that night. They disputed that Helwick intentionally

22

allowed Atkins to leave, but for purposes of this appeal we assume that plaintiff's evidence is admissible and demonstrates that Helwick acted intentionally.

Defendants contend that plaintiff's negligent voluntary undertaking claim is a legally improper "attempt to circumvent the ruling of *Ann M.*, and *Sharon P.*" They rely on *Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190 (*Alvarez*), in which, after rejecting a premises liability negligence claim against a restaurant by survivors of a restaurant patron who was murdered in the restaurant, the court also rejected a voluntary undertaking theory. (*Id.* at pp. 1212–1214.) The decedent was murdered when a member of a group who fought with him verbally in the restaurant and physically in the restaurant parking lot earlier in the evening returned and shot him in the chest. (*Id.* at pp. 1194–1197.) The plaintiffs' theory was that the restaurant staff, after summoning the police, failed to "properly inform[] the police of the risks of violence [the restaurant] knew existed in [the restaurant] that evening." (*Id.* at p. 1196.) Instead, the police were told by a restaurant employee that the fight had already dispersed and that it was " 'okay for them to leave.' " (*Ibid.*) The appellate court affirmed the trial court's grant of nonsuit on this claim after concluding the murderer's "return *with deadly force* and cold-blooded shooting of Alvarez" were not foreseeable. (*Id.* at pp. 1210–1211.) It also rejected the plaintiff's alternative theory that "a duty was created when the restaurant voluntarily undertook to aid plaintiffs by calling the police" and that the restaurant "breached that duty by failing to give the police complete information about the antecedent dispute." (*Id.* at pp. 1212–1213.)

Plaintiff argues that *Alvarez* is distinguishable, and we agree. The *Alvarez* plaintiffs' premises liability and voluntary undertaking claims were premised on the same basic duty: to prevent or protect the decedent from the murder. (See *Alvarez*, *supra*, 100 Cal.App.4th at pp. 1193, 1201.) The resulting harm, the death of plaintiffs' loved one, was also the same under both theories. Thus, the question of whether the murder was foreseeable was the same whether the issue was a general duty to warn or a specific duty to provide police with information.

Here, on the other hand, plaintiff's premises liability claim posits defendants had a duty to protect patrons against third party criminal misconduct of a sexual nature, and the harm is the emotional distress that flowed to her from that criminal misconduct. However, her voluntary undertaking claim posits defendants had an additional, voluntarily undertaken duty as a result of Helwick's and Atchison's promises to call the police and restrain the perpetrator until police arrived. The emotional harm resulting from a failure to do so, she contends, is over and above the emotional distress she suffered because of Atkins's criminal acts. The issue of foreseeability for plaintiff's negligent undertaking claim is thus different from that for her premises liability claim.

*Alvarez* does not address or hold that a voluntary undertaking claim based on acts distinct from those that form the basis of a premises liability claim is foreclosed. Further, as plaintiff points out, *Delgado* undermines the notion that the two doctrines are mutually exclusive. (See *Delgado*, *supra*, 36 Cal.4th at p. 235, fn. 13 [no need to apply negligent undertaking doctrine where issue could be resolved under special relationship doctrine]; *id*. at pp. 247–250 [discussing two doctrines as "separate" while holding foreseeability is element of both]; see also *Margaret W*., *supra*, 139 Cal.App.4th at pp. 152, 162 [separately addressing special relationship and voluntary undertaking claims].) We therefore reject defendants' argument that plaintiff's negligent voluntary undertaking claim cannot lie if the premises liability theory is not viable.

Defendants also argue plaintiff cannot establish all of the elements of her negligent voluntary undertaking "because there is no evidence in the record to show an increased risk of harm or reasonable reliance or injury." According to defendants, their "actions did not, and could not increase the risk of harm to [plaintiff] [because] the peeping incident and any resulting harm had already occurred." In the same vein, they contend that "[t]he injuries complained of here all flow[ed] from Atkins' peeping." In so arguing, defendants misconstrue plaintiff's claim and disregard her evidence. The harm she claims from their release of Atkins and failure to call the police is of the same kind, but is not the same, as the harm from the incident itself, as we have discussed. This is sufficient to establish that she relied on their promises and was injured as a result. It was also

24

foreseeable that having made these promises and induced plaintiff to go back inside the pub, defendants' failure to follow through on them would cause her to suffer added emotional distress.

Having determined that plaintiff established the basic prerequisites for applying the voluntary undertaking doctrine, we must now turn to the *Rowland* factors as the third step in the analysis of whether defendants had a duty. It is here that plaintiff's negligent voluntary undertaking theory founders. Our own research shows that more than one court has observed that "foreseeability is of limited usefulness in delineating duty in emotional distress cases." (*Lawson v. Management Activities, Inc.* (1999) 69 Cal.App.4th 652, 657; see *Thing v. La Chusa* (1989) 48 Cal.3d 644, 663 ["foreseeability of the injury alone is not a useful 'guideline' or a meaningful restriction on the scope of the [negligent infliction of emotional distress] action . . . [because] 'it provides virtually no limit on liability for nonphysical harm' "]; *Bro v. Glaser* (1994) 22 Cal.App.4th 1398, 1437 [referring to numerous Supreme Court cases indicating that "foreseeability is useless in establishing duty in purely emotional distress cases"].) In view of the limited value of foreseeability in such pure emotional distress cases, Division Three of this court has emphasized the importance of the *Rowland* factors and public policy in determining whether there is a duty. (See *Camenisch v. Superior Court* (1996) 44 Cal.App.4th 1689, 1693–1694, 1697 & fn. 3.)

The first *Rowland* factor is "the degree of certainty that the plaintiff suffered injury." Again, where, as here, "only emotional distress is claimed, the degree of certainty that plaintiff suffered injury is diminished." (*Fluharty v. Fluharty*, *supra*, 59 Cal.App.4th at p. 495.) This factor weighs against imposing a duty.

The second *Rowland* factor, "the closeness of the connection between the defendant's conduct and the injury suffered," is not particularly helpful to plaintiff. On the one hand, plaintiff has offered evidence that she suffered significant emotional distress following the incident—including anxiety and physical symptoms such as nausea and heart palpitations—for which she received therapy and was treated with anxiety medications. On the other hand, the serious distress she alleges, such as phobia about

going to public restrooms, public places generally, and downtown Santa Rosa in particular, and her nightmares and more general anxiety, is connected much more closely to the incident with Atkins itself than it is to the acts of Helwick and Atchison. True, she testified that after Helwick released Atkins she was afraid he might come after her. But the facts that police apprehended him the following day and apparently did not inform her of their doing so makes the connection between Helwick's act and her fear attenuated. In short, her evidence indicates her primary emotional injury was not closely connected with defendants' failure to call police or continue to restrain Atkins.

On the other hand, the moral blame factor outlined in *Rowland* weighs in plaintiff's favor. Accepting plaintiff's evidence as true, defendants, after agreeing to call the police and preserve the status quo until the police arrived to investigate, instead took it upon themselves to decide whether Atkins committed a crime, release him from their custody and refrain from even calling the police. This conduct is especially blameworthy because Helwick's own wife had experienced a similar incident, which would lead a reasonable person to be skeptical of Atkins's excuses that he entered the women's room "by mistake" because he was "drunk" and "fell down in the bathroom stall." On the other hand, as defendants point out, Helwick's and Atchison's acts did not appear to pose any risk of physical harm or severe fright or shock to plaintiff, since they occurred after the incident. And while, if they acted as plaintiff contends, we do not condone what they did, their acts do not indicate an intent to harm plaintiff or anyone else.

Finally, the remaining public policy factors articulated in *Rowland*—"the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved"—weigh against imposition of liability here. Imposing a duty on the part of a commercial establishment to restrain an individual accused of criminal activity on the premises, even in the context of a voluntary undertaking to do so, is fraught with risk of both physical and other injury. A suspect intent on escaping may injure persons trying to restrain him. The restraint could also injure the suspect, result in assault or battery charges against the employee and/or

expose his employer to tort liability. If the suspect were wrongly accused, the employer or employee could be exposed to liability for false arrest or imprisonment. We rely on law enforcement officials to determine whether and how to detain criminal suspects and, in the course of doing so, to investigate—and for good reason. To impose a duty on defendants, such as those here, to physically restrain a criminal suspect would shift those responsibilities to private parties and risk turning the Good Samaritan into the vigilante. The "consequences to the community of imposing [such] a duty" (*Rowland*, *supra*, 69 Cal.2d at p. 113) counsel against it.

Of course, the same public policy does not apply to defendants' failure to contact police after stating to the distraught plaintiff that they would do so, and their failure to do so here was inexcusable. But as they point out, plaintiff herself contacted the police, who arrived within minutes of her call and not long after the incident. Thus, it cannot be said that plaintiff was appreciably harmed by defendants' failure to call the police. Having determined not to impose the duty on defendants to restrain Atkins even though they undertook to do so, we conclude that the failure to call the police in the circumstances here does not meet the threshold requirements for a voluntary undertaking. Defendants' failure to call police, standing alone, did not expose plaintiff to additional risk of harm from Atkins; nor did her brief reliance on it cause her significant injury.

For these reasons, we conclude that summary judgment was properly granted on plaintiff's negligent voluntary undertaking claim against defendants.

## DISPOSITION

The judgment of the trial court is affirmed. Defendants are entitled to costs of appeal.

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

MILLER, J.